## APPEAL OF C. W. AHL.

## APPEAL OF E. W. BIDDLE ET AL.

### [E. W. BIDDLE ET AL. v. C. W. AHL ET AL.]

FROM THE DECREE OF THE COURT OF COMMON PLEAS OF CUMBERLAND COUNTY, IN EQUITY.

Argued May 3, 1889—Decided October 21, 1889.
[To be reported.]

1. Where an opinion of the court below, in a proceeding in equity, though stating that the court was compelled to close the case by overruling pro forma the exceptions filed, yet shows that the court did not decide the case without examination or without reaching a conclusion, the Supreme Court will give the decree full effect as disposing of the questions of fact, unless the appellant can overcome its prima facies and clearly point out its errors.

2. If an assignment of real and personal property be made to another, who agrees to hold the property and apply the income thereof to the debts of the assignor, and the assignor, at the same time, sell and convey to the assignee other property, the assignee to hold the purchase money and to apply it to the same object, the assignee is liable to account, as a trustee, for all the funds that come into his hands from the property of the assignor.

3. An account rendered by a trustee to his cestui que trust, is not affected by the general rule that where a seller renders an account to the buyer of goods sold and delivered, the buyer must object within a reasonable time, otherwise his conduct will be regarded as an admission of the items of which the account is made up; the reason for the exception being that the cestui que trust has not the means of verifying the account.

Statement of Facts.

4. If an accounting trustee withhold books and sources of information, under his control, from a master appointed to state an account for the trustee who has failed to render proper accounts himself, thus rendering the master no assistance and co-operation, but delaying and hindering him, he will not be permitted to show mistakes in the master's account by means of the books, etc., he withheld from inspection.

5. An agreement providing for the division of profits arising from the manufacture of iron at an iron works belonging to a defendant, is not without a sufficient consideration to support it, when it recites and purports to rest upon a sale of the iron works on the previous day by the plaintiff to the defendant, and a transfer of the entire plant upon the terms stated in the contract.

6. Where valuable services were rendered by a trustee, and important responsibilities borne by him for many months, and large sums of money collected and disbursed by him in the discharge of the trust, an allowance of commissions to him may not be disturbed on the ground that he mingled the trust funds with his own, and was reluctant to give the master the benefit of his books and his aid in adjusting the trust estate.

Before Paxson, C. J., Sterrett, Williams, McCollum and Mitchell, JJ.

Nos. 52 July Term 1889, and 439 January Term 1889, Sup. Ct.; court below, No. . . . August Term 1885, C. P. in Equity.

On April 21, 1885, E. W. Biddle and A. A. Thomson, as "assignees for the benefit of creditors" of Peter A. Ahl and Daniel V. Ahl, individually and trading as P. A. Ahl & Bro., filed a bill in equity, against C. W. Ahl and Thomas W. Ahl, individually and trading as C. W. Ahl & Son, in substance averring:

1, 2. That E. W. Biddle and A. A. Thomson are assignees for the benefit of creditors of P. A. Ahl, D. V. Ahl and P. A. Ahl & Bro., and all the parties live in Cumberland county, Penn.

3, 4. That Daniel V. Ahl and Carey W. Ahl had been for many years partners in the manufacture of iron at Boiling Springs, in Cumberland county, up until January 1, 1877, when said partnership was dissolved and a new firm composed of Carey W. Ahl and Thomas W. Ahl was formed, who carried on the same business at the same place, under the firm name of C. W. Ahl & Son.

5. The new firm used the same real estate as the old. This consisted of 68 acres of land, on which were erected a furnace,

forge, dwelling houses, mill and other buildings, of which C. W. Ahl and D. V. Ahl each owned a moiety; and of 9,000 acres of woodland, including ore banks, adjoining said 68 acres, of which $\frac{1}{8}$ was owned by C. W. Ahl and $\frac{7}{8}$ by D. V. Ahl.

6. That C. W. Ahl and T. W. Ahl agreed with D. V. Ahl to account with him for all pig iron made at the furnace, at the rate of 45 cents per ton of 2240 pounds; and at the rate of 45 cents per ton of 2454 pounds of blooms made at the forge from April 2, 1877; and for every cord of wood used, at the rate of 40 cents per cord, excepting that what was cut from the Brindle tract should be 22 cents per cord; and the rents received from the houses were to be credited to the parties jointly.

7. That C. W. Ahl & Son should receive the rents, issues and profits of six farms owned by D. V. Ahl, and known as the Burnt Barn farm, the Red Barn farm, the Peters farm, the Binn farm, the Lehman farm, and the Beetem farm.

8. That they should account with D. V. Ahl for royalties on railroad ties and rails, and for cinder sold, and for the purchase money of the Coffee farm, the Otto farm, the White House property, and other pieces of land in which D. V. Ahl or P. A. Ahl had an interest, and for stone taken by them from the quarries or lands of D. V. Ahl or P. A. Ahl.

9. They were also to receive and account to D. V. Ahl for $\frac{7}{8}$ of $75,000, paid by the Reading Coal & Iron Co. on the settlement of a lease of ore banks.

10. And they were to apply the share of Daniel V. Ahl in all the moneys received by them to the payment of debts and liabilities of D. V. Ahl, whether individually or jointly with P. A. Ahl.

11. In pursuance of this agreement C. W. Ahl & Son took possession of said 68 acres of land and of the ore banks and woodland. They ceased the manufacture of iron on April 2, 1883, but continued to use the woodland and tenements. They received the rents and profits of the lands sold, the purchase money of the Coffee farm, etc., the $75,000 from the Reading Coal & Iron Co., and large sums of money belonging to D. V. Ahl, aggregating above $500,000.

12. Included in this aggregate, and under the same general agreement, they received proceeds of bonds of the Harrisburg & Potomac R. Co. amounting to $242,750, and, in addition,

proceeds of other bonds and of the stock of said railroad company to an amount unknown.

13. While acting under the said agreement, and for the alleged purpose of raising and securing more money to pay the debts and liabilities of D. V. Ahl and P. A. Ahl & Bro., D. V. Ahl and P. A. Ahl executed a mortgage to C. W. Ahl for $75,000, dated February 13, 1882, and it was then also agreed that on settlement of the accounts of C. W. Ahl and D. V. Ahl, the amount found due from the former to the latter should be credited on the mortgage, and that all the accounts of C. W. Ahl against D. V. Ahl should be shown to him, and if any errors were found therein they should be corrected and likewise credited on the mortgage, if the amount found due is less than $75,000.

14. After the execution of the mortgage, P. A. Ahl and D. V. Ahl, by written agreement, sold to C. W. Ahl and T. W. Ahl a half interest in the Cleversburg ore bank for $35,000, of which $30,000 was to be credited on the mortgage; and in said agreement there was the previous general agreement to account, and to credit D. V. Ahl on the mortgage with any amount that might appear due to him on settlement of all accounts. A half interest in said property had been sold previous to sale of mortgage for $25,000, which was to be credited to D. V. and P. A. Ahl in the general account.

15. Under the same general agreement, a still further large amount of money and property was received by defendants which can only be known after discovery is compelled.

16. It was agreed that all moneys and profits received by C. W. Ahl or T. W. Ahl or by C. W. Ahl & Son, under liability to account, should be accounted for in a general account, in which credit should be allowed for all payments made for or on account of P. A. Ahl and D. V. Ahl and P. A. Ahl & Bro.

17. Partial accounts were furnished; but they were imperfect and unintelligible and never accepted by P. A. Ahl and D. V. Ahl, who demanded proper and full accounts, which were never furnished.

18. Defendants have always refused to exhibit a full and true account of all moneys received; have rendered no intelligible account of moneys applied to debts and liabilities of D. V. Ahl and P. A. Ahl and P. A. Ahl & Bro., and have refused to exhibit their books and accounts.

19. A correct account will show the defendants largely indebted, but to what amount cannot be averred with certainty until they have been compelled to discover what they have received and paid out under said agreements. When the $75,000 mortgage was executed to C. W. Ahl, it is verily believed a much smaller sum was due; but it was given in reliance upon the representation of defendants, who had entire control of all accounts, that they would make a full exhibit of them and correct any errors therein.

20. Defendants have in their control the books, papers and accounts which will show or ought to show the actual state of the accounts between the parties, and which they conceal.

A paragraph 6½ in an amendment to the bill averred an agreement dated April 3, 1877, in which C. W. Ahl bound himself to account to D. V. Ahl for one third of all the profits from the manufacture of iron at Boiling Springs during a period of six years from April 2, 1877, to be paid to him or applied to his debts and liabilities, being the agreement referred to in paragraph 6 of the bill. But said profits had not been so paid or applied and no account thereof had been rendered.

The prayers were for discovery, for account and for payment of the sum found due on an account stated; and, also, for an account of the profits from the manufacture of iron and for payment of the share found due, if not shown to have been appropriated in discharge of debts, and for general relief.

The answer denied the material averments of the bill, and averred that full discovery had been made, and specific accounts of each transaction under the various agreements rendered; that the agreement of April 3, 1877, was without consideration; that the mortgage for $75,000 was given in consideration that C. W. Ahl would release the lien of judgments held by him to the amount of $76,271, and take a second mortgage for the same, to enable the sum of $40,000 to be raised by means of a first mortgage and applied in discharge of judgments to that amount held by other creditors and prevent sales on executions; that his liens were released and satisfied according to this special agreement, and the excess of $1,271, above the mortgage, was charged on his books in his account with D. V. Ahl; and that it was also then agreed to correct errors if any, and credit them on this mortgage, but no errors were alleged and none had been discovered.

The cause having been put at issue it was referred to *Mr. C. P. Humrich* and *Mr. W. A. Kramer*, as examiners and masters, who returned a large amount of testimony taken and found the facts substantially as follows:

D. V. Ahl and C. W. Ahl owned the real estate as described in paragraph five of the bill; D. V. Ahl owned the real estate as described in paragraph seven; D. V. Ahl and P. A. Ahl owned the real estate as described in paragraph eight, and also the Bomberger and the Cleversburg ore banks; D. V. Ahl or P. A. Ahl or P. A. Ahl & Bro. owned stock and bonds of the Harrisburg & Potomac R. Co., the par value of which exceeded $500,000, P. A. Ahl having been the contractor of the road, and D. V. Ahl, president of the company during its construction.

C. W. Ahl and T. W. Ahl formed a partnership as C. W. Ahl & Son on January 1, 1877, and succeeded to the business of the former partnership between C. W. Ahl and D. V. Ahl at the same place, and used the same real estate under a written lease from D. V. Ahl, until April 2, 1883.

This lease provided that C. W. Ahl & Son should account for every ton of 2,240 pounds of pig-iron, and for every ton of 2,454 pounds of blooms manufactured, at the rate of forty-five cents per ton; and for every cord of wood taken from the mountain land at forty cents per cord; and at twenty-two cents per cord for all wood taken from the Brindle tract, during a term of years, to be paid quarterly; also that they were "to keep up all repairs to the works in their usual order;" that "the taxes accrued and accruing on said property will be paid by C. W. and T. W. Ahl, and a regular account kept, and the amount shall be an offset against D. V. Ahl's general interest in the property leased;" and that "all the houses except the mansion house shall be rented and the amount credited to the parties jointly."

It was agreed that C. W. Ahl & Son should account to D. V. Ahl for the proceeds received from the farms and other property, except stone, as stated in paragraph 7 of the bill. They were to receive and to account to D. V. Ahl for seven eighths of $75,000, paid by the Reading Coal & Iron Co. for lease of ore banks, as stated in paragraph 9 of the bill. They were to apply all the share of D. V. Ahl in the moneys, so to be accounted for, to the debts and liabilities of D. V. Ahl, individually, and jointly with P. A. Ahl.

In pursuance of these agreements they took possession of the properties therein mentioned, manufactured iron and blooms from April 2, 1877, to April 2, 1883, and received the moneys arising from rents, royalties, farm produce and sales of land, and the $75,000 paid by the Reading Coal & Iron Co.; and C. W. Ahl received $242,750 from the Philadelphia & Reading R. Co. for stocks and bonds of the Harrisburg & Potomac R. Company, belonging to P. A. Ahl, to be applied to the debts of D. V. Ahl, P. A. Ahl, P. A. Ahl & Bro. and of the Harrisburg & Potomac R. Co.

D. V. Ahl and P. A. Ahl, for the purpose of making more money, to be raised and applied to their debts, executed a mortgage for $75,000, to C. W. Ahl, on February 13, 1882. There was then an open and unsettled account between D. V. Ahl and C. W. Ahl, and the latter agreed in writing that this amount should be examined and all errors corrected and credited on the mortgage.

On August 29, 1882, in a written agreement signed by all parties, D. V. Ahl and P. A. Ahl agreed to sell and convey to C. W. Ahl and T. W. Ahl a half interest in the Cleversburg ore banks for $35,000, of which $30,000 was to be credited on the mortgage, in which agreement it is contained; "said mortgage having been given with the understanding that, if any credits were due the said D. V. Ahl upon settlement of C. W. and D. V. Ahl's account, the same are to be credited upon said mortgage." A half interest had been previously sold for $25,000, which was to be applied to the debts of the vendors or credited in the general account. All moneys and proceeds received by C. W. Ahl, T. W. Ahl or C. W. Ahl & Son, under such liability to account, were to be accounted for either under a general or special account, and they were to be allowed credits for all payments made on account of the liabilities of D. V. Ahl and P. A. Ahl, individually and jointly.

Partial and fragmentary accounts of receipts and disbursements, imperfect and unintelligible were furnished, but not accepted as final and conclusive. No proper and full account was ever rendered, and the defendants refused to exhibit their books and accounts.

The masters further found that there was a written agreement signed and sealed on April 3, 1877, supplementary and

in addition to the lease of April 2, 1877, by which C. W. Ahl agreed to account for one third of the profits from the manufacturing of iron, and that his estate was bound by such agreement.

The masters thereupon stated an account against C. W. Ahl by which they found a balance in favor of the plaintiffs, and in this account they allowed $10,000 to C. W. Ahl, as compensation for his services as trustee. Both sides filed exceptions to the masters' report, the character of which exceptions will appear in the following opinion of the court by BARNETT, P. J., 41st judicial district, specially presiding:

It will be seen that the masters find the facts to be substantially as set forth in the plaintiffs' bill. And if they are correct in so finding, then, as they say, the questions to be disposed of are those of accounts between the parties for money received, on the one side, and its appropriation and expenditure, on the other.

A large mass of testimony was taken and considered by the masters, and they concluded their first report in which they found, including $37,000 of bonds, a balance of $80,820.43 in favor of the plaintiffs. A number of exceptions were filed to this report and upon due application of the defendants the case was opened for still further testimony. When this additional testimony had been taken and considered, the masters allowed many of the exceptions and filed their final report, finding a balance of $10,363.40 due to the plaintiffs, including interest.

To this report seventy-four exceptions have been filed by the defendants and eight by the plaintiffs. It is impossible in the period limited to us, and with the time that can be spared from other duties, to discuss these exceptions in detail.

The plaintiffs' exception No. 1 is because the masters allowed $10,000 to C. W. Ahl in compensation for his services. But they have found that he was not guilty of fraud, or of such gross negligence, that should work a forfeiture of commissions, and that for the very valuable services rendered, the sum allowed is not excessive. We do not see any sufficient reason to disagree with this finding: Stewart's App., 110 Pa. 410. Exception No. 2 is to the allowance of a large number

of credits for improvements made to the iron works, and for ore, for mules, for payment of certain judgments, and for other items which, so far as we have been able to investigate, we are unable to say have been improperly allowed. Exceptions Nos. 2½ and 7 complain that credit was allowed for vouchers 260 and 474 erroneously, because the payments were of the debt of C. W. Ahl to D. V. Ahl, and that a charge should have been made for the debt so paid, because it was for purchase money of land sold by D. V. Ahl to C. W. Ahl. The masters find that the vouchers were clearly sustained by the evidence, and there is no evidence of the conveyance of any land as alleged. We cannot say that such finding is erroneous, and we think we ought not to sustain the plaintiffs' exceptions above mentioned. The remaining exceptions, Nos. 3, 4, 5 and 6, relate to the profits coming from the manufacture of iron and blooms, termed the second branch of their claim. Exceptions to the masters' report of these profits have been filed in both sides. Since the whole controversy will be taken to the Supreme Court for final review, and we see nothing that we can do to lighten the labor of that court, we will simply overrule all of the plaintiffs' exceptions.

For the defendants, it was argued that the several statements made from time to time by defendants, were accounts rendered, and which, from not having been objected to, became accounts stated by acquiescence. The rule in regard to accounts stated is not well settled, either with regard to the effect of the accounts themselves, or in respect to the parties between whom the rule shall apply. The earlier Pennsylvania cases hold, especially where there have been no pre-existing mutual accounts between the parties, that statements furnished to and retained by the party were not admissible in evidence against him: Killam v. Preston, 4 W. & S. 15; Mellon v. Campbell, 11 Pa. 415: Spangler v. Springer, 22 Pa. 454. In the later case of Verrier v. Guillou, 97 Pa. 63, it was said by Mr. Justice TRUNKEY, on page 68: "an account rendered to a party indebted by his creditor, and not objected to in a reasonable time, is prima facie evidence against the party to whom it is rendered."

In some of the states the rule is held to apply only between merchants: Anding v. Levy, 34 Am. Rep. 435, and notes.

Opinion of Court below.

In Mellon v. Campbell, supra, on page 418, it is said: "Between merchants dealing together and merchants having mutual accounts, if an account stated is furnished by one to the other, which is retained for a length of time without objection, it is good evidence in an action, of account stated. But where there has been no pre-existing debt or dealing between the parties, such a statement as was here furnished could be no evidence against the defendant." See generally on the subject of accounts, Lockwood v. Thorne, 62 Am. Dec. 81, and the notes appended.

In this case, there could not well be said to have been mutual dealings between the parties. The defendants were agents or trustees for the plaintiffs, and in many respects resembling assignees for benefit of creditors. They claimed credits for the amounts of numerous personal checks. These were not evidence of money loaned to or paid for the plaintiffs: Flemming v.'M'Clain, 13 Pa. 177; Masser v. Bowen, 29 Pa. 128. It was contained in written agreements that defendants' accounts should be examined and corrected. Of these agreements it may be said, as it was by Mr. Justice TRUNKEY, in Verrier v. Guillou, 97 Pa. 68, of the tone of the letter in that case, that they were "not consonant with defendants' belief that plaintiffs had admitted the accounts to be correct by silence or otherwise." Nor can it be argued that these accounts acquired the conclusive character of accounts stated, from the giving of the mortgage after they had been received; because in the 11th paragraph of defendants' answer it is alleged that this mortgage was given for the specific purpose therein mentioned, and not with any reference to the accounts previously rendered. We are of opinion that under the facts of this case the plaintiffs were in no wise concluded by the statements rendered.

We are further of the opinion that the accounts annexed to the answer and made parts thereof were not responsive to the bill. It is true, discovery is called for, but it is 'the discovery of books, papers and accounts and other matters of information touching the matters complained of, so that a true and just account may be stated therefrom as to all matters and things mentioned in the bill. The partial statements had already been received and were not accepted; the original sources of information were called for, from which a correct general account

could be stated; and, since these original sources were all in the hands of the defendants, they were called for to be inspected, and to be used in endeavoring to arrive at a full and just statement: Seitz v. Mitchell, 4 Otto 580.

We are also of the opinion that T. W. Ahl is an incompetent witness for the defendants. Since the commencement of this suit C. W. Ahl, the principal defendant, has died. His death has closed the mouths of the plaintiffs in regard to any transactions with him before his death. T. W. Ahl was called as a witness generally for the defendants. He was not competent before the act of 1869, "for whilst one of the parties to a contract in litigation is denied the privilege of testifying, the policy of the law is to close the mouth of the other:" Graves v. Griffin, 19 Pa. 176. He has not been rendered competent since the act of 1869. The act of 1887 provides that when a party to a thing or contract in action is dead, and his right thereto or therein has passed to a party on the record, who represents his interest in the subject in controversy, the surviving or remaining party to such thing or contract, or any other person whose interest shall be adverse, shall not be a competent witness, etc. This clearly excludes the plaintiffs. If now, T. W. Ahl is permitted to testify, the inequality is produced which it was the purpose of the law to prevent. In construing the act of 1887, "the real intention when accurately ascertained, will always prevail over the literal sense of terms." "When the expression in a statute is special or particular, but the reason is general, the expression should be deemed general." When T. W. Ahl was called to testify, "that mutuality or equality did not then exist between the parties, which is necessary to permit a party to testify in his own behalf:" Eshleman's App., 74 Pa. 47, 48; Hanna v. Wray, 77 Pa. 27.

We are of opinion, therefore, with the learned masters, that the questions for them to dispose of were questions of accounts. These accounts, extend over a long space of time, refer to a number of different transactions, and embrace a very large number of different items, and require a great deal of labor and time to combine them into one general account that will do justice to the parties. The learned masters have devoted to them patient and painstaking industry; they are learned in the law and skilled accountants, and the result of their efforts

is a monument to their ability.   The correctness of this result depends upon an accurate computation, based on the rightful admission or rejection of every item submitted to their consideration.   It is true, the inquiry has now become very much narrowed, by restriction only to the disputed items.   But an examination of these would require more time than is permitted to us; and as it is extremely important that the rights of the parties should be finally adjusted at the earliest term of the Supreme Court, we are reluctantly compelled to close the case here, by pro forma overruling the defendants' exceptions and confirming the report of the masters, which is hereby done by adopting the decree recommended therein.

And now, February 26, 1889, this case came on to be heard upon bill, answer and proofs, and was argued by counsel; and thereupon upon consideration thereof, it is ordered, adjudged and decreed, as follows:

1. That Thomas W. Ahl, executor of the estate of Carey W. Ahl, deceased, do forthwith pay to A. A. Thomson and E. W. Biddle, assignees of Peter A. Ahl and Daniel V. Ahl, the sum of $10,363.40.

2. That Thomas W. Ahl, executor of the estate of Carey W. Ahl, deceased, do forthwith cancel and satisfy the mortgage of P. A. Ahl and D. V. Ahl to C. W. Ahl, as recorded in Mortgage Book Q., vol. 1, page 542.

3. That Thomas W. Ahl, executor of the estate of Carey W. Ahl, deceased, do forthwith pay the costs and fees of this proceeding as follows to wit: . . . . .

4. That as to C. W. Ahl & Son and Thomas W. Ahl individually, the bill is dismissed.

C. W. Ahl thereupon took the appeal to No. 52 July Term 1889, specifying that the court erred in pro forma overruling defendants' exceptions, and in not sustaining their exceptions.

The plaintiffs took the appeal to No. 489 January Term 1889, specifying that the court erred in sustaining the masters' award of $10,000 to C. W. Ahl, as compensation for his services as trustee.

*Mr. J. W. Wetzel, Mr. W. Trickett* and *Mr. John Hays*, for C. W. Ahl:

Arguments.

1. The Supreme Court will reverse a pro forma decree, as the court below is bound to examine the evidence in returning the facts: Worrall's App., 110 Pa. 349; Dyer's App., 107 Pa. 446; Morgan's App., 125 Pa. 561; Wilbur's App., 10 W. N. 101; Shaw v. Allegheny, 115 Pa. 46.

2. The masters were asked to find that the accounts rendered, as the bill alleges, in pursuance of the contract, were, if not excepted to in a reasonable time, at least prima facie evidence of the propriety of the credits claimed in them. This they refused to do, but declared them no evidence whatever. This was error: Emmons v. Stahlnecker, 11 Pa. 366; Sergeant v. Ewing, 30 Pa. 75; Bevan v. Cullen, 7 Pa. 281; Thompson v. Fisher, 13 Pa. 310; Porter v. Patterson, 15 Pa. 229; Colket v. Ellis, 10 Phila. 375; Lockwood v. Thorne, 11 N. Y. 170 (62 Am. Dec. 81); Phillips v. Tapper, 2 Pa. 323. The party attacking a settled account, here the mortgagor, must specifically point out the errors: Young v. Hill, 67 N. Y. 162 (23 Am. Rep. 99); Phillips v. Beden, 2 Edw. Ch. 1; Brown v. Vandyke, 4 Halst. 801; Gage v. Parmalee, 87 Ill. 337; Greeve v. Harris, 11 R. I. 22; Johnson v. Curtis, 3 Br. C. C. 267.

3. The agreement of April 3, 1877, was without consideration, and courts of equity will not enforce a one sided agreement: Meason v. Kaine, 63 Pa. 335; Grove v. Hodges, 55 Pa. 504; Dornan's Est., 2 W. N. 522; Philips v. Mining Co., 7 Phila. 619; Sidle v. Anderson, 45 Pa. 464; Geiger v. Cook, 3 W. & S. 266; Penna. Co.'s App., 86 Pa. 102; Leonard v. Duffin, 94 Pa. 218; Candor's App., 27 Pa. 119. Moreover, the claim was stale and not enforceable: Hawthorn v. Bronson, 16 S. & R. 269; Todd's App., 24 Pa. 429; Ashhurst's App., 60 Pa. 290; Evan's App., 81 Pa. 278; Neely's App., 85 Pa. 387; Holme's App., 79 Pa. 279; Emerick v. Emerick, 3 Gr. 295; Cadwalader's App., 57 Pa. 158; Miller v. Henlan, 51 Pa. 265; Callen v. Ferguson, 29 Pa. 247.

4. The answer was responsive to the bill, and it must therefore be taken as verity until it is overcome by two witnesses or their equivalent: Eaton's App., 66 Pa. 483; Eberly v. Groff, 21 Pa. 251; Campbell v. Patterson, 95 Pa. 447; Cresson's App., 91 Pa. 168; Gleghorne v. Gleghorne, 118 Pa. 383.

*Mr. S. Hepburn, Jr.*, and *Mr. E. W. Biddle*, for E. W. Biddle and A. A. Thompson:

Under the findings of the masters, the trustee should not have been allowed compensation for his services: Stehman's App., 5 Pa. 413; Norris's App., 71 Pa. 126; Clauser's Est., 84 Pa. 54; Witman's App., 28 Pa. 376; Smith's App., 47 Pa. 424; Swartswalter's Acc't, 4 W. 77; Stearly's App., 38 Pa. 525; Dyott's Est., 2 W. & S. 557; Robinett's App., 36 Pa. 191.

### C. W. AHL'S APPEAL.

OPINION, MR. JUSTICE WILLIAMS:

The objects of the bill in this case were discovery and an account. The facts on which the plaintiffs' right to the relief sought rested, are shown by the report of the master to be as follows:

Daniel V. Ahl, Peter A. Ahl, and Carey W. Ahl were brothers, residing in Cumberland county, and for many years actively engaged in business. Prior to 1887, D. V. Ahl was doing business as an individual. He was engaged in the manufacture of iron at the Carlisle Iron Works with his brother C. W. Ahl, and he was also transacting business in connection with Peter A. Ahl under the firm name of P. A. Ahl & Bro. He was at the same time president of the Harrisburg & Potomac Railroad Company, which was then constructing its line of road through Cumberland county. P. A. Ahl and P. A. Ahl & Bro. were contractors with the railroad company for the work of construction, and were to receive their pay almost entirely in the stock and bonds of the railroad company. In the effort to secure the completion of the road, D. V. Ahl, P. A. Ahl, and P. A. Ahl & Bro. had invested money and pledged their credit to an extent that brought serious financial embarrassment to them. In this juncture the advice of family friends and persons interested in the early completion of the road was sought, and after a conference it was decided that the interests of the parties and those of the railroad company required the speedy completion of the section of the road between Langsdorf and Jacksonville, which was then being built by P. A. Ahl & Bro., but that embarrassments of the contractors were so serious as to make it desirable that the work should be done in the name of some other party. A formal transfer was accordingly made by P. A. Ahl & Bro. to Q. P. & T. W. Ahl, who finished the section, which was accepted by the company,

and the stock and bonds delivered in payment therefor. As part of the same general arrangement, it appears that C. W. Ahl was to undertake the conversion of the property of D. V. Ahl and P. A. Ahl & Bro. into money, and the payment of the debts of D. V. Ahl as an individual, and those of the firm of P. A. Ahl & Bro., with the money so received. To this end the partnership between D. V. Ahl and C. W. Ahl in the Carlisle Iron Works was dissolved. A new firm, composed of C. W. Ahl and T. W. Ahl, his son, was formed under the firm name of C. W. Ahl & Son. The new firm bought the interest of D. V. Ahl in the stock of materials, pig-iron, blooms, tools, etc., on hand at the time of the dissolution, and agreed to pay royalties for the ore and wood used for charcoal and other purposes, taken from the lands owned in part by D. V. Ahl. C. W. Ahl & Son also bought some real estate from D. V. Ahl. The money thus falling due from the firm of C. W. Ahl & Son for stock, materials, tools, etc., and for royalties and purchase money, was to be paid to C. W. Ahl, who was also to receive the stock and bonds due from the railroad company to P. A. Ahl & Bro., to P. A. Ahl and D. V. Ahl, and who was to collect the rents due on several farms belonging to D. V. Ahl, and then in the hands of tenants. With these moneys, and the share of the profits of the Carlisle Iron Works which he agreed to pay to D. V. Ahl, he was to pay the debts of D. V. Ahl and P. A. Ahl & Bro., as fast as was reasonably practicable. Several hundreds of thousands of dollars passed through the hands of C. W. Ahl under this arrangement, and the purpose of this bill was to secure a final account from him. The answer alleged the proper appropriation of all the money received, and the payment of a considerable sum in addition thereto, so that a balance of many thousand dollars was due from the plaintiffs to the defendant.

The statement of the account was referred to two masters, who heard the parties at great length, investigated the transactions involved, and stated an account between them, showing a balance due from the accountant. Their report was presented to the court, excepted to, recommitted for further hearing, modified by the masters on rehearing, and again laid before the court. It was again excepted to, the exceptions argued for several days before the court, and after further consider-

ation the court concurred in the findings of the masters, and made the decree recommended by them.

Our first question is over the effect that should be given to this decree, and grows out of an expression made use of by the learned judge in his opinion. In that opinion, after a discussion of some of the legal questions involved, he says, speaking of the details of the account: "To this report seventy-four exceptions have been filed by the defendant, and eight by the plaintiff. It is impossible, with the time that can be spared from other duties, to discuss these exceptions in detail." In another part of the opinion he refers to the items of the account covered by the exceptions thus: "An examination of these would require more time than is permitted to us; and, as it is extremely important that the rights of the parties should be finally adjusted at the earliest term of the Supreme Court, we are reluctantly compelled to close the case here by a pro forma decree overruling the defendant's exceptions, and confirming the report of the masters." The use of the phrase "pro forma decree" is held by the plaintiff in error to justify the position that the questions were not considered by the learned judge, but turned over to this court for examination upon the report of the masters and the evidence. But we do not so understand the court below. It is reasonable to suppose that the word "examination," in the second of these extracts, was used in the same sense by the learned judge as the word "discussion," in the first, and referred to the separate treatment in his opinion of each of the eighty-two exceptions on file. We do not understand him to say, nor does his opinion indicate, that he has not considered the questions which were raised and elaborately discussed before him, but we understand him to say that he has not the time to put his reasons on the record for his ruling on each exception. He cannot "examine" or "discuss" separately each separate question raised for want of time; and for that reason he makes his decree, giving only such reasons for it as he has time for. Such a decree is in no sense a pro forma decree, notwithstanding the use of the words by the learned judge who entered it. The opinion states the views entertained upon the important legal questions involved, and concurs in, without discussion, the conclusions of fact reached by the masters. Speaking of the work of the masters, the judge fur-

ther says in his opinion: "The learned masters have devoted to them [the accounts] patient and painstaking industry. They are learned in the law and skilled accountants, and the result of their efforts is a monument to their ability." Taking the opinion as a whole, it seems quite clear to us that the learned judge did not decide this case without examination, nor without reaching a conclusion upon the questions of fact, but that after examination and hearing he intended to concur with the masters. For this reason we feel justified in giving full effect to the decree. It disposes of the questions of fact, unless the appellant can overcome its prima facies, and point out its errors clearly.

Our next legal question is, what was the relation existing between D. V. and C. W. Ahl, after the dissolution of the firm of C. W. Ahl & Bro., and the transfer of his property by the former to the latter for the payment of debts? It was not that of vendor and vendee simply, although C. W. Ahl & Son were purchasers of large amounts of property, real and personal, from D. V. Ahl, as part of the general arrangement. The purchase money was not to be paid to D. V. Ahl, but it was to remain in the hands of C. W. Ahl for the purpose of enabling him to pay the debts of his brothers. It was to be used in the same manner as the stock and bonds of the railroad company, and the rents and royalties derived from the real estate of D. V. Ahl. The whole fund, from whatever source derived, was impressed with a trust created by the surrender of the property to C. W. Ahl for appropriation to a specific use, and by its acceptance by him for that purpose. By this arrangement C. W. Ahl was invested with the control of this property, he was entitled to the custody of the fund, and he was bound to apply it upon the debts of D. V. Ahl and P. A. Ahl & Bro. He was not the legally appointed, but the voluntarily chosen, assignee of his brothers, and he held the assigned estate upon the trusts and for the uses contemplated by the arrangement. The masters were right, therefore, in holding him liable to account as a trustee for all the funds that came to his hands from the property of D. V. Ahl and P. A. Ahl & Bro., whether derived from real or personal estate.

Another question raised is whether the partial accounts that were attached to the answer as exhibits were proof, prima fa-

cie, of the items appearing on them, so as to shift the burden, and compel the plaintiff to show them to be incorrect, or be bound by them. They had been furnished to D. V. Ahl, and he had made no specific objection; and this, it was contended, was an admission of their correctness. The general rule that where a seller renders an account to the buyer of goods sold and delivered to him, and he does not object within a reasonable time to the correctness of the account, his conduct will be regarded as an admission of the items of which the account is made up, is familiar, and will not be controverted. The reason for the rule is that the transaction is fully within the knowledge of the buyer. He knows what goods he has purchased; and if he receives the bill of the seller, and makes no objections after a reasonable time for examination, his conduct may fairly be regarded as an admission that the account rendered is correct, which may be given in evidence against him when he is called upon to pay for the goods, and will make a case against him prima facie. So, also, a principal, when notified of the acts of his agent, must disaffirm them within a reasonable time, or ratification may be presumed: Porter v. Patterson, 15 Pa. 229. But this rule is not applicable in the case of an accounting trustee, for the reason on which it rests is not present. The cestui que trust has not the means for verifying the account within his reach, except as to such items as may relate to himself personally; and his failure to object is fairly referable to his want of knowledge. The partial accounts under consideration afford an illustration. They were made up from the books of C. W. Ahl & Son, or those of C. W. Ahl. These books were not accessible to D. V. Ahl, and he had no right to demand an inspection of them. He had no means of telling whether the abstracts furnished him were correctly taken from the books of the individual or firm to whose transactions they related, or whether they correctly represented such transactions. If C. W. Ahl had kept, as trustee, an account with the trust-estate, as it was his duty to do, and the statements furnished to D. V. Ahl had been taken from the books so kept, a different question would be raised; but he kept no such accounts. His bank-accounts, if examined, would have afforded no help, for he mingled the moneys belonging to the trust, those belonging to himself, and those belonging to

C. W. Ahl & Son together, and deposited them all to his individual credit. D. V. Ahl had therefore no means of verifying the statements furnished him, and he was in no position to admit or deny their correctness. His failure to object raises no presumption against him, and the burden of proof remains on the accountant.

The masters were right in requiring C. W. Ahl to account for all the moneys he received, and show to what uses it had been applied. But as the defendant had kept no account with the trust-estate, and had no books to lay before the masters, how were they to proceed? They had necessarily to set about gathering the materials from which to make up the trustee's account. The profits realized from the Carlisle Iron Works, the rents, royalties, and purchase money due from C. W. Ahl & Son, could be collected from the books of C. W. Ahl and C. W. Ahl & Son. These books were under the control of the accountant, and he should have made haste to place them at the service of the masters, and to render them all the aid in his power in extracting from them whatever related to the trust. Instead of doing what was his plain duty in this respect, he produced such books as he was required by an order of court to produce, and not until their production was necessary to avoid a charge of disobedience. The masters complain in their report that, in their efforts to state an account, they met at the hands of the accountant, not co-operation and assistance, but evasion, delays, and a withholding of the means of information that were under his control. Having left them to grope after the facts as well as they could without his aid, it is with very poor grace that the accountant now comes to allege his ability to convict them of error by books that have been all this time in his possession or within his control. These books should have been laid before the masters. The accountant's knowledge of what they contained should have been put at their service, and his aid rendered them in stating the account. His personal interest and considerations of duty both demanded this of him. This bill was filed soon after the manufacture of iron at the Carlisle Iron Works by C. W. Ahl & Son ceased. The circumstances were then fresh in memory. What books were kept at the furnace by his employees, and for what purposes, he must have known; and they were subject

to his order. His attention was drawn by the amended bill to the subject of profits in the manufacture of iron. No one could know what they were, or had the means for fixing the total amount of such profit, so well as he. But he stated no account, he did not produce the books of his firm, or help the masters to the items from which the account could be made up. After they had done the best they could without the help he was in duty bound to render, he proposes to show that they have made some mistakes, by means of the books heretofore withheld from them. This is not a position calculated to recommend the accountant to consideration at the hands of a chancellor. The same judge who heard the cause in the court below heard the motion to reopen and recommit the report for the second time to the masters, and, after a full and protracted hearing, refused it on the merits. It is enough to say, upon the subject of the profits of the Carlisle Iron Works, that the masters had before them competent evidence on which their statement of the account can fairly stand. If the account as they have stated it bears heavily on the defendant in any particular, he should charge it to himself, and to his conduct during the examination. His position was antagonistic to the masters from the outset, and he compelled them to go in search of facts which he should have furnished, and which it now seems he had the means for furnishing.

The complaint that the masters did not give sufficient weight to the mortgage for $75,000, given by D. V. Ahl to C. W. Ahl, as affording evidence of an indebtedness for that sum of money existing at the date of the mortgage, is equally unfounded. The answer of the defendants states that the mortgage was given to take the place of a judgment held by C. W. Ahl, which he was then about to release in order that a new mortgage might be made by D. V. Ahl for $40,000, which should be a first lien on the lands of D. V. Ahl bound by the judgment, and be negotiated to raise money for the purposes of the trust. The mortgage thus substituted for the released judgment was made to take effect subject to the lien of the mortgage for $40,000, and was accompanied by an agreement in writing providing in explicit terms that the mortgage should stand for so much as might be found to be due to C. W. Ahl on settlement, and no more. The mortgage was given, there-

fore, according to defendant's version of it in his answer, not because the precise sum named in it was due at its date, but as a device for continuing the lien previously furnished by the released judgment until the amount really due upon it could be ascertained.

The question over the competency of T. W. Ahl as a witness is clearly immaterial. The masters thought him incompetent, but they heard him under objection, and, upon consideration of his testimony, they find him to be unworthy of credit. It would be idle, therefore, if we thought the masters wrong on the question of competency, to send this case back to them for that reason, when we know that his testimony was rejected on the ground that he was not credible, if competent. Questions of credibility are for the courts that see and hear the witness, and their decision is not reviewable under any ordinary circumstances.

Another question which has been earnestly pressed by counsel, relates to the validity of the agreement of April 3, 1877, for the division of the profits arising from the manufacture of iron at the Carlisle Iron Works. It is urged that this agreement is not binding because of the want of a consideration to support it; but it recites the agreements of sale and lease made on the previous day by D. V. Ahl, and purports to rest upon them. The consideration was the sale by D. V. Ahl of his interest in the iron works to his brother C. W. Ahl, and the turning over to him of the entire plant, upon the terms stated in the contract of April 2, 1877. This appears upon the face of the paper, and furnishes a sufficient consideration to support the agreement. There was nothing, therefore, on the face of the agreement, and there was nothing in the evidence, to justify the masters in holding it to be of no value.

The relation in which the parties stood to each other, the obligation to account, and the general lines of investigation being thus settled, what remains is a marshaling of the items of debt and credit. This was carefully done by the masters, and their work has been approved and concurred in by the court below. We have given time and labor to an examination of the account, and the alleged errors therein, and we do not feel constrained to disturb it. Upon some of the questions we might, if this was an original hearing on exceptions, reach

a different conclusion from that which the masters have reached, but we are satisfied that there was evidence before them on which their findings may rest, and we cannot now disturb them. At this stage of the case, we are not to balance the testimony with a view to settle the question of mere preponderance, for it is enough that there was competent evidence before the masters on which they might reasonably find as they did. If the defendant had been just to himself or his brother, whose confidence in him seems to have known no bounds, he would have kept the trust moneys separate from his own, and he would have kept full and accurate accounts with the trust-estate. Then, when called on to render an account of his important stewardship, he could have done so promptly and intelligently, and, if so required, submitted his account to the examination of a court of equity with confidence. Failing to do this, the least that he could do was to place the books on which he had made entries relating in any manner to the trust fund in the hands of the masters without delay, and to render them all the aid in his power in stating the account. He did none of the things that a court of equity had the right to expect of a trustee. His attitude was one of hostility, and obstruction. It resulted in delays and difficulty in the proceedings, and perhaps in uncertainty in results. If it also resulted in some mistakes, he cannot conscionably complain of it at this stage of the case.

Appeal dismissed, at costs of appellant.

E. W. BIDDLE ET AL.'S APPEAL.

OPINION, MR. JUSTICE WILLIAMS:

The principal reason for the appeal in this case is the allowance by the masters of $10,000 to C. W. Ahl as compensation for his services as trustee. This, it is contended, should not have been allowed, because the trustee did not keep the trust funds separate, but mingled them with his own, and those of C. W. Ahl & Son, in such manner as to make it difficult to trace them, and because he did not put his books and papers relating to the trust-estate in the hands of the masters, but assumed and maintained an attitude of antagonism to them throughout their investigations. These, it is urged, are sufficient reasons for denying compensation, and have been so

recognized by the courts of this state in several cases which are cited.

But the masters ruled this question on what they considered the peculiar facts of this case. They admitted the existence of the general rule set up, but they declined to apply it in this case, because of reasons that were special to it. They found that valuable services had been rendered by the trustee; that important responsibilities had been assumed and borne for many months by him, and that large sums, reaching an aggregate of nearly a half million of dollars, had been collected and disbursed among the creditors of D. V. Ahl and P. A. Ahl & Bro. Speaking upon this subject in their report, they say of the defendant: " He was thus rendering them valuable services in their embarassed condition, and his purpose clearly was to relieve them from their pressing obligations, and, if possible, to extricate them from their financial difficulties, without giving much heed to the requirements of the law in keeping the trust funds intact, and the rendering of exact accounts of receipts and disbursements, with vouchers, as required of a trustee." For the reason thus stated by themselves they allowed compensation, notwithstanding the failure of the trustee to keep the funds and the accounts of the trust estate separate from those that belonged to himself or to his firm. The services rendered were certainly of great value to D. V. Ahl, to P. A. Ahl, and to their creditors. The account as stated by the masters charges the accountant with all he has received, so that no loss has been sustained by those entitled to the fund; and the masters report that notwithstanding his bad methods, and his apparent reluctance to give them the benefit of his books and his aid, he is entitled to an allowance for his services. Fortunately, there is no unbending rule which a court of equity is bound, under all circumstances, to apply in cases of this kind; but that may be done which in good conscience ought to be done in each particular case. As the masters and the court below concur in the opinion that compensation should be allowed, we are not inclined to disturb the decree upon this ground; but it must nevertheless be modified.

When the decree was made, there was pending in the court below a bill in favor of Q. P. Ahl, one of the parties in whose names the section between Langsdorf and Jacksonville was

completed, in which he claimed that bonds to the value $37,600, which had been received by C. W. Ahl, the trustee, belonged to him, and should be accounted for to him. This bill has now been disposed of by a decree of this court adversely to the claims of Q. P. Ahl, and the bonds claimed by him found to belong to the trust estate, and to have come properly into the hands of C. W. Ahl. The value of these bonds was not included in the original decree in this case because of the pendency of the bill of Q. P. Ahl; but they should now, since the dismissal of that bill, be accounted for by C. W. Ahl as part of the fund administered by him, and included in this decree. The decree as entered in the court below was for $10,363.40. To this should be added the value of the bonds involved in litigation when the decree was made, which was $36,700. A decree is therefore now entered for $47,963.40, with interest from the date of the decree in the court below. As the real contest on this appeal has been over the right to compensation, as to which the decision of the court below is sustained, no costs are awarded.

On January 6, 1890, the following was filed:

And now, January 6, 1890, the decree heretofore entered in this case is now amended so that it shall read as follows:

The decree of the court below is affirmed at the costs of the appellant.

