MARDEL SECURITIES, INC., Appellee and Cross-Appellant,

v.

ALEXANDRIA GAZETTE CORPORATION, Appellee,

and

Charles C. Carlin, Jr., Appellant and Cross-Appellee.

No. 8833.

United States Court of Appeals Fourth Circuit.

Argued March 28, 1963.

Decided June 29, 1963.

James H. Simmonds, Arlington, Va. (C. Wynne Tolbert, Arlington, Va., on brief), for appellee and cross-appellant, Mardel Securities, Inc.

Lawrence E. Blanchard, Jr., Richmond, Va., and John Barton Phillips, Alexandria, Va. (Hunton, Williams, Gay, Powell & Gibson, and John J. Adams, Richmond, Va., on brief), for appellant and cross-appellee, Charles C. Carlin, Jr.

Before SOBELOFF, Chief Judge, J. SPENCER BELL, Circuit Judge, and PREYER, District Judge.

PREYER, District Judge.

Mardel Securities, Inc., instituted this secondary action in its capacity as 48%

minority stockholder of the Alexandria Gazette against the Gazette and its principal officer, Charles C. Carlin, Jr., the latter being the owner of 52% of the outstanding stock issued by the Gazette. Plaintiff alleges that Carlin is indebted to the Gazette in substantial amounts occasioned by reason of Carlin's ownership and operation of a newspaper known as the Arlington Daily Sun which Carlin caused to be printed at, and partially operated from, the physical plant of the Gazette, the Sun having no printing facilities. Plaintiff contends that the amounts charged to the Sun by the Gazette resulted in substantial losses to the Gazette for which Carlin, by reason of his fiduciary capacity, is liable to the Gazette. The trial court found that Carlin operated the Sun with only slight regard for the financial welfare of the Gazette, that Carlin in his fiduciary capacity as officer and director of the Gazette, violated the cardinal rules applicable to his position, and that legal fraud in the management of the Gazette, as related to the operation of Carlin's personal asset (the Sun) was established by the evidence. The matter was then referred to a master to find the total indebtedness of Carlin to the Gazette. Judgment was entered for Mardel, and both Mardel and Carlin appealed. The action, while maintained by the minority stockholder, is actually for the use and benefit of the Gazette Corporation pursuant to Rule 23(b) of the Federal Rules of Civil Procedure.

Mardel's appeal raises the issue of the measure of damages employed by the court and referee in determining Carlin's indebtedness.

Carlin's appeal questions the correctness of the trial court's finding that Carlin was guilty of legal fraud; that Mardel was not barred by acquiescence, laches or improper motive in acquiring its Gazette stock; and the manner of applying Carlin's past payments on his admitted indebtedness.

The stock ownership of the Alexandria Gazette, termed "America's Oldest Daily Newspaper," has been the source of continuous litigation in state and federal courts for a number of years. See Foster v. Carlin, 4 Cir., 200 F.2d 943 and Foster v. Carlin, 4 Cir., 218 F.2d 795. For many years the newspaper was wholly owned by Carlin's father, and it was upon his death that litigation began which ultimately resulted in Carlin obtaining 52% of the Gazette common stock under a settlement agreement between members of the Carlin family. The ownership of the 48% minority interest was initially in Carlin's daughter, Sara Perine Carlin. Mardel acquired this interest in November, 1952. The present action does not seek to hold Carlin responsible for his activities with respect to the operation of the Gazette for any time prior to the date Mardel purchased the stock, other than as to the admitted amount due by Carlin to the Gazette as of December 31, 1952, of $80,218.99.

In 1942 Carlin began operation of the Arlington Daily (later the Arlington Daily Sun). This newspaper was solely owned by Carlin in his individual capacity. The Sun (or its predecessor) was continuously printed, and in part published, by the Gazette under a verbal arrangement between Carlin and the Gazette from April, 1942, until April 1, 1953. Under this arrangement the charges made to Carlin by the Gazette for printing the Sun were confined to the actual cost of the raw materials, newsprint, type metal, ink and dry mats. These raw material charges were manufacturer's costs only and did not include storage or draying charges. The Gazette furnished to Carlin's newspaper all news features and other services without charge.

The first written record in the Gazette's corporate minutes relating to the operation of the Sun appears in the minutes of April 1, 1953, at which time Carlin was absent due to illness:

"The business of the Corporation was discussed. Consideration was given to the terms upon which the Gazette would continue to print the Daily Sun. After some discussion it was moved, duly seconded and car-

ried that Messrs. Phillips and Stearman be authorized to work out and to put into effect terms that would in their opinion be proper and equitable to both the Gazette and Mr. Carlin. In view of the relationship between the Gazette and the Daily Sun, it was agreed that no interest would be charged on the account of Mr. Carlin, incurred by reason of his publication of the Daily Sun."

This meeting was held approximately four months following Mardel's acquisition of the 48% minority interest, and at a time when the minority stockholder had no representation on the Board of Directors.

The Phillips-Stearman formula,[1] put into effect in 1953, allocated a number of additional charges to the Sun. Certain charges which had been recommended by the Gazette's certified public accountants were not made, however. No pro-rata charges were ever made to the Sun for editorial or news coverage salaries. The national advertising revenue (from advertising solicited and secured on a joint basis for the two publications) was split on an equal basis between the two papers although the Gazette had a substantially larger circulation than the Sun and was the predominant cause of the sale of national advertising.[2]

Stearman testified that under the charges in effect before the adoption of the Phillips-Stearman formula (i. e. where the Sun was charged only the actual cost of raw materials) Carlin was not charged more than 25% of the actual cost of printing the Sun. Nevertheless Carlin was indebted to the Gazette for the printing of the Sun in the amount of $80,218.99 as of April 1, 1953. This debt admittedly had been overdue for several years previously when the Board of Directors in April, 1953, resolved not to charge Carlin any interest on this amount. Stearman and Carlin contended that the justification for this undercharge and this failure to collect the interest due was the protection accorded to the Gazette in having the Sun in friendly hands, thus eliminating competition in a rapidly growing area. Stearman testified that it was the price the Gazette was paying Carlin not to sell the Sun. Such a value is difficult to determine with exactness, and while the publication of the Sun was undoubtedly of some value to the Gazette by limiting competition we do not find that Carlin has established that the value would reasonably approach the loss the Gazette has sustained in printing, and in part publishing, the Sun. This is especially true when we know that Carlin had ample time in earlier years to effect a merger of the two papers. There is considerable testimony from Carlin and his witnesses that it was his intention and purpose to build up the Sun and eventually merge it into the Gazette. But this intention remained amorphous and unformulated. As Carlin testified:

"Q. You say it was your intention to have the newspaper you were starting work with the Gazette with the ultimate intention that they be merged; is that right?

"A. Yes, if it proved advantageous and it looked like it was a good opportunity that they be merged."

The Sun was sold in March, 1957, for $112,500. The purchase agreement imposed additional obligations upon the

---

1. Phillips, a practicing attorney, joined the Board on March 1, 1963, as Executive Vice-President. Stearman was the Gazette auditor until March 1, 1953, when he became comptroller. On September 1, 1953, he also became General Manager.

2. The Phillips-Stearman formula continued this practice which was begun in September, 1951. Prior to September, 1951, the 12¢ per line rate was divided between the two publications on the basis of 8¢ to the Gazette and 4¢ to the Sun. According to the Audit Bureau Circulation the circulation figures are as follows:

| Gazette | Year | Sun |
|---------|------|------|
| 10,415 | 1953 | 5,824 |
| 11,342 | 1954 | 6,797 |
| 11,750 | 1955 | 8,017 |
| 12,465 | 1956 | 8,892 |
| 13,130 | 1957 | 8,660 |

Gazette[3] but the Gazette received none of the proceeds of the sale as consideration for undertaking these obligations. The entire proceeds of the sale inured to Carlin's benefit. It is true that the agreement provided that all payments received by Carlin shall be first applied to the satisfaction of Carlin's debts to the Gazette, but such a proviso undertakes to do nothing more than Carlin is obligated to do, i. e. to pay the Gazette what Carlin concedes is due and owing. Nor did the Gazette receive any portion of the proceeds to represent the increase in value of the Sun over a period of years by reason of the Gazette's assumption of a part of the cost of printing, publishing, and operating.

■ The principles applicable to one in a fiduciary capacity as officer and director are well known.

"The purpose of the law is to secure fidelity in the director. If, in violation of the general rule, he places himself in a position in which he may be tempted, by his own private interest, to disregard that of the corporation, his transactions are voidable at the option of the corporation and may be set aside without showing actual injury. One who is entrusted with the business of another cannot be allowed to make that business an object of interest to himself."

Rowland v. Kable, 174 Va. 343, 6 S.E.2d 633, 642. To the same effect see Wight v. Heublein, 4 Cir., 238 F. 321 where the court pointed out that directors are:

"* * * preclud[ed] * * * from doing any act, or engaging in any transaction, in which their own private interests will conflict with the duty they owe to the stockholders, and from making any use of their power or of the corporate property for their own advantage."

■ The burden rests upon Carlin to prove the fairness of his transactions involving the commingled operation of the Sun and the Gazette, and to show the inherent fairness of those transactions from the point of view of the Gazette transaction. Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281; Geddes v. Anaconda Copper Mining Co., 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425. The burden is increased by virtue of his being the Gazette's majority stockholder. Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 590, 23 L.Ed. 328. We agree with the court below that Carlin has failed to meet this burden.

In fairness to Carlin it should be emphasized that what is involved here is legal fraud and not actual fraud. He made no profit for himself from the operation of the Sun. In fact, he sustained a substantial personal loss thereby, approximately $100,000. As far as legal fraud is involved, however, the point is that if Carlin's personally owned paper was a bad investment, it would have been an even worse one had not the Gazette borne

---

3. The sale of the Sun imposed additional obligations upon the Gazette in that (1) a newsprint tonnage contract executed by the Gazette and Carlin was made operative to the purchaser's benefit for a period of 5 years, subject to the purchaser's ability to receive a mill contract to purchaser's satisfaction; (2) Carlin agreed, as majority stockholder of the Gazette, to enter into joint ventures with the purchaser for the future sale of national advertising and display advertising, wherever combined advertising was requested, with the revenue being divided according to paid circulation of each newspaper, the agreement being for an indefinite term; (3) as to then existing combination advertisements, Carlin agreed that the share of revenues would remain in accordance with the understanding between the Gazette and Sun in March, 1957; (4) Carlin agreed, individually and through the Gazette, not to lease, operate, edit, print or conduct any newspaper or advertising paper in Arlington County and that portion of Fairfax County served by the Sun and Northern Virginia Advertiser, for a period of ten years from April 1, 1957; (6) in the event of fire, disaster, or labor difficulties, the parties respectively agreed to permit each other to print the paper of the affected party on the basis of cost, plus an overhead figure to be agreed upon, but without charge for profits, for a period of three months.

a part of the costs of printing his paper. The stockholders of the Gazette cannot be asked to share in his personal loss.

It may be conceded, again in fairness to Carlin, that the Gazette has been his major interest in life, and that he has regarded the Sun as a sideline. His motive in establishing the Sun appears not to have been personal agrandizement but to strengthen the Gazette. But he placed himself in a position as a fiduciary requiring the highest degree of circumspection where proper actions as well as proper motives are required. Those in a fiduciary position, to paraphrase Justice Holmes, must cut square corners. His laxity in this respect is all the more difficult to understand when we consider that in litigation over the Gazette and the Arlington Daily in 1942, the decree of the court gave full directions to Carlin as to the management of the business so that rights of minority stockholders might be protected by reason of his commingled operation of two newspapers.[4] Carlin had notice, since 1942, of the obligations imposed on him by his fiduciary capacity. Far from following the 1942 decree with scrupulous care, he appears largely to have ignored it.

Carlin's basic defense is that during the period in question (January 1, 1953, to March 31, 1957) the terms and conditions under which the commingled operations were conducted were 1) set by the Board of Directors and not by Carlin and 2) were fair. He contends that it is not the province of the court to act as the general manager of a corporation and to substitute its judgment for that of an independent board of directors acting in the best interests of the stockholders of the corporation. The evidence indicates that Carlin was physically absent from the paper from November 12, 1952, to January 4, 1954. The crucial terms of the arrangement were set during this period by a disinterested board of directors after an independent study, Carlin contends.

The evidence does not support this view of the matter. We think the lower court properly concluded that the Board was not independent but was under the domination of Carlin, and that Carlin has failed to sustain his burden of es-

---

4. The state court decree reads in part as follows:

"That Charles C. Carlin, Jr., personally and individually shall pay in advance for the cost of producing and distributing a certain newspaper publication now known as the Arlington Daily which is published by the Alexandria Gazette Corporation. The daily cost to be so paid shall bear the same proportion to the daily circulation of the Arlington Daily as 82.74 bears to 8,000. This provision shall operate as of June 23, 1942.

"As of June 23, 1942, of the revenue derived from contracts then existing for what is known as local advertising and classified advertising entered into at a higher rate because of increased circulation thru the Arlington Daily, the Alexandria Gazette Corporation shall receive so much thereof as it would have received at the 1941 average rate, and of all over that amount 7½ cents per inch shall go to Charles C. Carlin, Jr., and 7½ cents per inch shall go to the Alexandria Gazette Corporation.

"From this date, when local, legal, and classified advertising is published in the Gazette and the advertiser also wishes it published in the Arlington Daily, the Alexandria Gazette Corporation shall receive such amount of the revenue therefrom as it would receive at the rate for Gazette publication alone, and all over that shall go to Charles C. Carlin, Jr.

"As of June 23, 1942, all revenue from local, legal, and classified advertising published exclusively in the Gazette shall go to the Alexandria Gazette Corporation; and all the revenue from local, legal and classified advertising published exclusively in the Arlington Daily shall go to Charles C. Carlin, Jr.

"As of June 23, 1942, all revenue derived from paid circulation of the Gazette shall go to the Alexandria Gazette Corporation, and all revenue derived from paid circulation of the Arlington Daily shall go to Charles C. Carlin, Jr.

"That the books of the Alexandria Gazette Corporation shall be kept so that the foregoing allocations of the cost of production and of the revenue can be conveniently made."

tablishing the fairness of the transactions. During the period in question the personnel of the Board of Directors consisted of Carlin's wife and Messrs. Stearman, Reenstjerna and Bridgeforth. All of the latter were employees of the Gazette and had no stock in the corporation. Their tenure on the Board was dependent upon their being employed by the Gazette. In 1953 Mr. Phillips joined the Board. He had been Carlin's personal attorney. The Board's failure to insist on a merger of the papers, its failure to charge interest on the $82,000 due in 1953, its failure to insist on regular payments on this indebtedness and its failure to require Carlin to put up any security therefore, its willingness to permit Carlin to withdraw approximately $8500 of the Gazette's funds to purchase bank stock in his own name and pocket the dividends, its approval of the purchase agreement (only after its execution by Carlin) imposing additional obligations on the Gazette without receiving any consideration therefor, and finally its approval of the Gazette's bearing a large part of the cost of printing the Sun as the price for keeping the Sun in friendly hands without once documenting this position in the minutes and without any enforceable guarantee on Carlin's part— these are not the actions of a genuinely independent Board. Nor do the Board's actions establish the fairness of the transactions involved.

We think the trial court was correct in its finding of legal fraud.

 Carlin advances the further defense that plaintiff is barred by its acquiescence and laches from obtaining relief. We agree with the principle advanced by Carlin that a stockholder suing on behalf of the corporation must act promptly after acquiring knowledge of the conditions of which he complains or be barred, Backus-Brooks Co. v. Northern Pac. Ry. Co., 21 F.2d 4 (8th Cir. 1927), but find that the facts of the present case do not bring the principle into play. The present suit was instituted in May,

1957. Mardel acquired the stock in November, 1952, with sufficient knowledge, plaintiff contends, of the conditions it now attacks as constituting fraud. A delay of four and one-half years in bringing suit under these circumstances might well constitute laches, nothing else appearing. But the evidence indicates further that Mardel filed a suit in the State Court only twenty-four days after it had acquired its Gazette stock. This suit was never brought to trial for reasons that are not explicit in the record. This suit was eventually dismissed by a voluntary non-suit in January, 1957. The defendant contends that Mardel's lack of diligence was solely responsible for this abortive suit. The evidence, however, indicates that during this period a number of meetings were held between Schneidman, Mardel's President, and Stearman or Carlin, or Carlin's attorney concerning the matter of the charges the Gazette was making for printing the Sun.[5] In addition Mardel caused the taking of a special audit by an accountant selected by it, Mr. Abbit, in June or July of 1954 and again in July of 1957. Mardel consistently expressed its dissatisfaction with the amount and nature of the information furnished to it. The evidence does not support a determination that Mardel acquiesced in Carlin's activities when it had sufficient knowledge of the facts. Rather, the evidence indicates that Mardel consistently expressed its disagreement with Carlin's actions throughout this period both through judicial proceedings and through the corporate process itself (at stockholders' meetings), and that Mardel never had complete notice of the wrongs involved during this period, (for example, the Phillips-Stearman formula appears never to have been fully disclosed to Mardel)

 The defendant also contends that Mardel's motives were such that relief should be denied in this case. The trial court acknowledged that "the motives of Mardel in acquiring this stock are not free from doubt." The trial

---

5. Schneidman testified there were at least twenty such meetings.

court apparently had in mind the evidence indicating that Mardel acquired its stock with the intention of immediately bringing suit. We think the motive of Mardel does not bar relief on the facts of this case, however, for two reasons. First, the motive is immaterial since the action seeks no redress for Carlin's actions prior to November, 1952, when Mardel purchased the stock, but only complains of the wrongful acts of Carlin *after* such purchase. Dimpfell v. Ohio & M. R. Co., 110 U.S. 209, 3 S.Ct. 573, 28 L.Ed. 121; Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528; Pollitz v. Gould, 202 N.Y. 11, 94 N.E. 1088, 38 L.R.A.,N.S., 988. Secondly, this is a derivative action. For rights accruing subsequent to the acquisition of a minority stock interest, the motives of the minority party are immaterial as long as the action is, in fact, instituted by the minority stockholder and not controlled by other parties. Johnson v. King-Richardson Co., 1 Cir., 36 F.2d 675, 67 A.L.R. 1465; Young v. Higbee Co., 324 U.S. 204, 214, 65 S.Ct. 594, 89 L.Ed. 890.

## MARDEL'S CROSS APPEAL

■ Mardel's cross appeal is based on a disagreement with the formula applied by the district court in determining the charges against Carlin. The district court held that in determining how much Carlin owed the Gazette, the charges should be determined on the basis of allocating to the Sun all "additional costs" —all costs incurred by the Gazette for printing the Sun that the Gazette would not have incurred if there had been no Sun. Mardel contends that a correct formula would require Carlin to account for the full values of materials and services received by him on the same basis he would have been charged had he been dealing with a stranger.

There is no inflexible rule of damages in a case of this nature. "Fortunately, there is no unbending rule which a court of equity is bound, under all circumstances, to apply in cases of this kind; but that may be done which in good con-

science ought to be done in each particular case." Appeal of Biddle, et al., 129 Pa. 26, 18 A. 474, 475 (1889); Richardson v. Blue Grass Mining Co., D.C., 29 F. Supp. 658 (1939). The basic objective of the courts has been to restore the parties to their original positions. Rowland v. Kable, 174 Va. 343, 6 S.E.2d 633, (1940); Upton v. Southern Produce Co., 147 Va. 937, 133 S.E. 576, 580. We think the formula adopted by the district court accomplished this objective and did equity in the case. The formula recognizes that there were some benefits to the Gazette from the arrangement with the Sun, and it recognizes that under the circumstances of this case the Gazette should not make a profit on the arrangement. The test suggested by Mardel when applied concretely results in figures that are demonstrably inequitable. For example, Mardel contends that the Gazette should recover $666,711.84 for the item of printing alone, basing this on what an unrelated printer would charge for printing a newspaper like the Sun. The amount claimed by Mardel is some six times the amount the Sun was sold for. The Mardel formula would not restore the parties to their original position but rather would result in bestowing a windfall profit on the Gazette in excess of any amounts which the Gazette has ever made from printing its own newspaper. We think the district court's formula was just and proper.

■ Carlin attacks the district court's measure of damages in one respect, contending that the court erred in reapplying Carlin's past payments on the admitted indebtedness of $82,000 first to accrued interest and the remainder to principal. Carlin's position is based on the decision of the Board of Directors not to charge interest on the principal amount. But it would be incongruous to allow Carlin to benefit from what has been determined to be an element in legal fraud. We think the district court properly concluded that Carlin should be put in the same position that Mardel would have occupied if it had been able to borrow $82,000 from the corporation—i. e. that

repayments on the indebtedness should be applied to interest accrued and the remainder to principal in accordance with the general rule. Salinger v. Lincoln Nat. Ins. Co. (C.A. 8th), 52 F.2d 1080, 80 A.L.R. 242; Lightfoot v. Price, 4 Hen. & M. (14 Va.) 431; Fultz v. Davis, 26 Grat. 903 (67 Va.).

We have studied the Master's report with care and find that it applies the district court's formula fairly and painstakingly. We approve it in all its details.

Affirmed.