The **ENSTAR GROUP, INC.,** Plaintiff,

v.

**Richard J. GRASSGREEN,
et al., Defendants.**

**Civ. A. No. CV–90–A–1235–N.**

United States District Court,
M.D. Alabama, N.D.

Feb. 9, 1993.

John R. Matthews, Jr., Tabor R. Novak, Jr., Ball, Ball, Matthews & Novak, P.A., Montgomery, AL, Hobart McWhorter, Michael Pennington, T. Michael Brown, Birmingham, AL, for Kinder–Care.

M. Roland Nachman, Jr., Maury Smith, Montgomery, AL, for defendant Grassgreen.

David Byrne, John Bolton, Montgomery, AL, for defendant Mendel.

Bobby Lee Cook, Cook & Palmour, Summerville, GA, for defendant Mendel.

## MEMORANDUM OPINION AND ORDER

ALBRITTON, District Judge.

This case was tried to a jury and resulted in a verdict awarding both compensatory and punitive damages to the Plaintiff. The case is before the Court on equitable issues which were not submitted to the jury at the trial, matters for the Court to determine by agreement of the parties, and the Defendant's post-trial motion relative to punitive damages.

Evidence presented at trial established the following facts:

## I. FACTS

Perry Mendel founded Kinder–Care, Inc. ("Kinder–Care")[1] in 1969. In the beginning, Kinder–Care was designed to provide child care. Over the years, however, Kinder–Care diversified into other areas. As of November 1989, Kinder–Care was, through its subsidiary Kinder–Care Learning Cen-

---

1. The company was actually founded as Kinder–Care Learning Centers, Inc., and its name was changed to Kinder–Care, Inc., when the stockholders approved an amendment to the Certificate of Incorporation at their annual meeting on February 12, 1987. Because a later subsidiary and eventual spin-off was also called Kinder–Care Learning Centers, Inc., the original company will be referred to as Kinder–Care for simplicity.

ters, Inc. ("KCLC"), the largest proprietary provider of child care in the United States. In addition, it provided, through subsidiaries, a wide range of services, including financial, insurance and specialty retail.

KCLC began operating as a wholly-owned subsidiary of Kinder–Care in early 1987.[2] Prior to that time the child care operations were operated as an unincorporated division of Kinder–Care. In August 1988, KCLC issued approximately 7 million shares of common stock pursuant to an initial public offering and Kinder–Care retained 45 million shares or 87% of the common stock of KCLC.

In November 1989, Kinder–Care was restructured into two entirely separate companies—The Enstar Group, Inc. ("Enstar") and KCLC. The name of Kinder–Care, Inc. was changed to The Enstar Group, Inc. Enstar retained the financial, retail and insurance businesses of Kinder–Care, while KCLC retained the child care centers and certain other related operations. Through the corporate restructuring, Kinder–Care/Enstar disposed of its remaining shares in KCLC and, as a result, KCLC became a separate and unrelated public company with separate operations, management and ownership.

Mendel served as Kinder–Care's President from 1970 to October 10, 1985, and as its Chairman of the Board and Chief Executive Officer from October 1985 through October 1989. Richard Grassgreen was Kinder–Care's Executive Vice President and Director and remained in that capacity until October 10, 1985. He then became President and Chief Operating Officer of Kinder–Care until it became Enstar in November 1989. He was also Corporate Secretary of Kinder–Care from August 1969 through June 2, 1989. Particularly pertinent to this case, Grassgreen was Kinder–Care's investment manager, exercising sole direction over where the corporation's funds were invested.

When KCLC began operating as a separate subsidiary, Mendel remained its Chairman. Grassgreen was KCLC's President and Chief Executive Officer from April until June 1988, and then from June of 1988 until May 1989 he was Vice Chairman and Chief Executive Officer. He also remained a Director of KCLC until May 1989.

In connection with the restructuring of the companies in 1989, Mendel became Chairman of the Board and Chief Executive Officer of KCLC and served as such until his retirement in February 1990. Also in November 1989, Grassgreen became Chairman, President and Chief Executive Officer of Enstar. He remained in these positions until October 17, 1990, when he resigned. After the restructuring, Grassgreen was no longer an officer of KCLC.

Sometime in the early to mid 1980s, Grassgreen and Mendel entered into a general partnership together, Megra Partners. This partnership was created as a vehicle for their personal investments. They were equal partners.

Michael Milken worked for Drexel Burnham Lambert, Inc. ("Drexel"), in the 1980s. Milken was an expert at raising large sums of money. Milken's primary method of raising cash was through the issuance of "junk bonds."[3] Much of this money was raised to facilitate a series of corporate takeovers that occurred in the 1980's. When an individual or corporation sought to take over another corporation, financing was normally needed to fund the deal. Investment bankers, such as Milken, would then arrange for the financing for the takeover. Because so many takeover deals never went through, Milken developed a procedure whereby money wasn't actually raised, initially. Rather, Milken would

---

2. The exact date KCLC began operating as a separate subsidiary is unclear from the evidence presented to this court. KCLC may have begun operating as a separate subsidiary as early as November 1986. It may have been called Kinder—Sub at that time.

3. The bonds were called "junk" because they were considered too risky to be investment quality bonds. While the risk associated with these bonds was significantly higher than other types of investments, the returns were also significantly higher. The interest rate paid on these "junk bonds" was normally several percentage points higher than what an investor could receive from investment quality bonds.

merely make sure that there were individuals or entities lined up who agreed to finance the takeover if the deal actually transpired. These agreements to fund the deals were called commitments. In return for committing to the investments, both for the deals that went through and for the deals that did not go' through, Milken would pay a fee to those individuals or entities that had made the commitments. These payments were called commitment fees. These fees were normally 0.75% of the amount committed.

During this period of time, Kinder–Care was generating large amounts of income which were being invested outside the business in an extensive investment portfolio. As investment manager for Kinder–Care, Grassgreen invested substantial sums of the corporation's money through Drexel. Drexel paid "commitment fees" in connection with numerous purchases or commitments to purchase by Kinder–Care of securities underwritten or to be underwritten by Drexel. The commitment fees were fees paid by Drexel or its clients to induce Kinder–Care to commit to purchase specified amounts of preferred stock or junk bonds. Drexel paid a total of $965,000.00 in commitment fees for Kinder–Care's agreement to invest in transactions involving the following companies: Unocal, Coastal Corp., Pantry Pride Inc., GAF Corp., Midcon, and Pacific Lumbar Co. Most of these fees belonged to Kinder–Care, which had risked or committed to put at risk tens of millions of dollars in investments for which the fees were paid. These fees, however, were instead paid to Megra Partners and were kept and used by Grass-

green and Mendel to make personal investments. Kinder–Care money was invested or committed, but instead of Kinder–Care receiving the fees paid in exchange for the investment or commitment, the fees were kept by the individual officers and directors who had committed the investment of their corporation's money.

Grassgreen and Mendel first became involved with Drexel's call for commitments in March 1985, when Coastal Corp., began a takeover attempt of American Natural Resources, Inc. ("ANR"). Grassgreen, through Megra, committed to purchase $20,000,000.00 of securities if the takeover was successful. A $150,000.00 commitment fee was paid to Megra, which Megra kept. While Megra received the commitment fee, Grassgreen used Kinder–Care's tax I.D. number to report the income.

Coastal was successful in its attempt to purchase ANR and, therefore, Megra was required to purchase $20,000,000.00 worth of securities. As it turned out, however, Megra only purchased $6,000,000.00 worth of the securities. Grassgreen and Mendel arranged for Kinder–Care to purchase the remaining $14,000,000.00 worth of securities that Megra had committed to purchase, and for which Megra received the commitment fee.[4]

In April 1985, Megra committed to purchase $30,018,000.00 of Unocal securities in a takeover attempt by T. Boone Picken. For this commitment, Megra received a commitment fee of $225,000.00. Megra again used Kinder–Care's tax I.D. number to report the fee. Grassgreen had Megra keep this fee and he did not advise Kinder–Care's board of the transaction.[5] This takeover attempt was unsuccessful and,

**4.** The only dispute regarding Coastal involved the amount of the commitment. Grassgreen claimed at trial that Megra only committed $10,000,000.00 and that Kinder–Care purchased only $4,000,000.00 worth of securities. His testimony was refuted by the commitment letter in Kinder–Care's records which showed that it purchased $14,000,000.00 worth of Coastal securities and by the commitment fee amount of $150,000.00 which was .0075 of $20,000.000.00. Accordingly the jury included $105,000.00 of this fee in the award of compensatory damages. (.0075 times $14,000,000.00).

**5.** Grassgreen claimed that he and Mendel intended to fund the commitment personally.

The jury, however, did not believe him and it included this commitment fee as part of the compensatory damages it awarded. The evidence showed that Grassgreen and Mendel had made no attempt to obtain a bank loan to fund the commitment, as they had done a month earlier for the smaller Coastal loan. Also, the fact that they could obtain a bank commitment for only $10,000,000.00 in connection with their $20,000,000.00 commitment to Coastal strongly suggests that they could not have obtained a $30,000,000.00 loan had they been called upon to honor their Unocal commitment.

therefore, there was never a request by Drexel to fund the commitment.

In November and December, 1985, Grassgreen committed Megra to purchase from Drexel securities involving the following takeover attempts, for which Megra received the following fees:

| Name | Amount Committed | Fee Paid to Megra |
|---|---|---|
| Pantry Pride | $18,000,000.00 | $112,500.00 |
| Pacific Lumber | $10,000,000.00 | $ 50,000.00 |
| GAF | $30,000,000.00 | $225,000.00 |
| Midcon | $27,000,000.00 | $202,500.00 |

The Pantry Pride and Pacific Lumber takeover attempts were successful and, therefore, Megra had to honor its commitment to purchase $18,000,000.00 and $10,000,000.00 worth of securities for the respective deals. Again, however, Megra did not purchase these securities; rather, Kinder–Care purchased the securities for which Megra had made the commitments and received the commitment fees. Kinder–Care's tax I.D. number was again used in each of these transactions to report the commitment fees. Only after being caught by the U.S. Attorney in October, 1990, did Grassgreen admit that he made the GAF and Midcon commitments and that all of these commitment fees which belonged to Kinder–Care had been paid to and kept by Megra.

Further, in late 1985, Grassgreen caused Kinder–Care, through its subsidiary, Care Investors, to invest $36,000,000.00 in an arbitrage partnership known as Cohen Feit.[6] At the same time, Megra became a limited partner in Cohen Feit South, a general partner in Cohen Feit. Under the Cohen Feit South partnership agreement, Megra would receive a general partner's override, the amount of which would increase if the arbitrage fund of Cohen Feit exceeded $50,000,000.00. Kinder–Care's initial investment was approximately 70% of the fund, the total of which slightly exceeded $50,000,000.00, so as to entitle Megra to the higher override. As a result of this investment of Kinder–Care funds in Cohen Feit, Megra received an override of $430,731.00 as a partner in Cohen Feit South.[7]

Also in 1985, Grassgreen caused Kinder–Care to invest $5,000,275.00 that was to be used to finance a buy-out of Storer Communications by one of Drexel's clients. Because of Kinder–Care's significant relationship with Drexel and because of Kinder–Care's investment, Michael Milken, in a telephone conversation with Grassgreen, offered Grassgreen and Mendel the opportunity to personally purchase Storer warrants through MacPherson Partners.

**6.** Additional investments totaling $15,000,000.00 were later made in 1986 through Kinder–Care's subsidiaries, Care Investors Inc., and Pioneer Western, Inc.

**7.** Grassgreen contended that he had advised Kinder–Care's Board of Megra's right to the override. The jury, however, did not believe him and included the $430,731.00 received by Megra in its verdict for compensatory damages. There was significant evidence to support this finding: (1) None of the corporate minutes which authorized the investment of Kinder–Care funds in Cohen Feit, which were prepared by Grassgreen, mention a partner's override for Megra; (2) Eddie Nabors, Kinder–Care's comptroller and a member of Care's Board, testified that he was never informed of an override for Megra; (3) Mendel testified that Grassgreen never mentioned the override to him or in any meeting of Kinder–Care's Board; (4) Grassgreen testified in the Milken trial that he had not advised the Board about the override (after Grassgreen was indicted, he agreed to cooperate with the government and part of that cooperation included testifying during Milken's criminal trial); (5) In October 1985, Grassgreen executed and delivered to Cohen Feit South an investor questionnaire that stated that Megra held its partnership interest "as nominee for Kinder Care"; and (6) Fred Berman, a director of Kinder–Care, testified that while he did not attend the Board meeting when the Cohen Feit investment was authorized, the override was never mentioned to him in any subsequent meeting or otherwise.

Grassgreen purchased these warrants with $15,224.00 from the Megra account, which contained the commitment fees which belonged to Kinder–Care. These warrants earned Grassgreen and Mendel $674,000.00 in profits. They received $337,080 on January 31, 1989 and $337,080 on April 17, 1989.

In March, 1986, Grassgreen invested $165,000.00 of the commitment fees that belonged to Kinder–Care in the common stock of THL Industries, Inc., (Hill's Department Stores). This stock was issued to Megra, and was later sold for $751,461.00.

On September 28, 1989, Grassgreen received a Supplemental Executive Retirement Plan ("SERP") from Kinder–Care. Under the SERP, Grassgreen would have been eligible to receive hundreds of thousands of dollars annually in retirement benefits for each of the next 20 years. Earlier, on July 31, 1981, Grassgreen and Kinder–Care had entered into an "Executive Benefit Agreement" under which Kinder–Care agreed to pay the premiums of a life insurance policy for Grassgreen. The Executive Benefit Agreement also provided for retirement benefits.

In January 1990, Enstar's Board became aware of Megra's investment in MacPherson as a result of a wide-ranging U.S. Attorney's investigation of Drexel and Milken. This prompted the Board to retain the law firm of Mayer, Brown & Platt as special counsel, to investigate whether Grassgreen and Mendel had received improper benefits in the MacPherson transaction or any of the other investments sponsored by Drexel. Although the MacPherson and the THL investments were specific subjects of special counsel's investigation, Grassgreen did not advise the special counsel or the Board that those investments had been paid for with commitment fees that rightfully belonged to Kinder–Care. Instead, Grassgreen continued to conceal the fact that Megra had received commitment fees, and, in fact, expressly misrepresented to the Board and to special counsel that he had received no commitment fees.[8] Also, Megra's records relating to the Drexel accounts which reflected the payment of commitment fees disappeared and, therefore, special counsel did not see them during the investigation. Grassgreen's misrepresentations, along with the disappearance from Megra's records of the Drexel documents, concealed the payment of commitment fees until records showing the fees were discovered in Drexel's papers by the U.S. Attorney in October, 1990 during his investigation of Drexel.

As a result of the investigation by special counsel, Enstar incurred legal fees and expenses in the amount of $260,394.72. Further, Grassgreen incurred legal fees and expenses in the amount of $68,552.23. With Grassgreen continuing to conceal and misrepresent his activities, so that Mayer, Brown & Platt was unaware of the commitment fees, special counsel determined that Grassgreen did not breach his fiduciary duty to the company. Therefore, Enstar paid Grassgreen's legal fees and expenses.[9]

In October, 1990, Grassgreen was allowed to resign his office as an alternative to being fired. As of the date of his resignation, Grassgreen was indebted to Enstar for advances taken against his bonus in the amount of $267,871.74.

---

8. In a letter dated May 14, 1990, Grassgreen, through his attorney, William J. Schwartz, informed the special counsel that he never received any commitment fees from Drexel as a result of securities that where purchased by Kinder–Care. Special counsel then reported this to Enstar in a letter dated May 25, 1990. Further, John Russell Thomas, a Board member, testified at trial that at a Board meeting in May 1990, Grassgreen was asked whether there were any other transactions, other than Mac-Pherson, in which he or Megra received some investment advantage as a result of a Kinder–Care investment. Grassgreen responded negatively.

9. Special counsel did determine that Grassgreen and Mendel should transfer to Enstar all profits from the MacPherson investment. Special counsel determined that these profits were forfeitable under the "gratuity" theory. The law of agency permits a principal to obtain from its agent any thing of value provided to the agent in connection with and in the course of his agency. Past profits from McPherson were paid to Enstar by Grassgreen and Mendel and were not claimed in this suit.

On October 19, 1990, Grassgreen agreed to plead guilty in the United States District Court for the Southern District of New York to one count of mail fraud in violation of 18 U.S.C. § 1341, in connection with the receipt of commitment fees relating to investments by Kinder–Care, and one count of securities fraud, in violation of 15 U.S.C. § 78j(b), in connection with his purchase of, and non-disclosure to Kinder–Care of, his receipt of the warrants offered to him as a result of Kinder–Care's investment in Storer Communication. Eventually, Grassgreen pled guilty only to securities fraud.

As a result of all this information coming to light, and as a part of plea agreements in criminal cases against them, Grassgreen and Mendel agreed to reimburse Enstar for portions of the money which they retained. Mendel presented Enstar with a check for $295,000.00, and Grassgreen presented them with one for $355,000.00. These checks were deposited in court after this suit was filed.

This action was originally filed by Enstar against Grassgreen and Mendel in the Circuit Court of Montgomery County, Alabama. Grassgreen and Mendel then filed notices of removal and the action was removed to federal court. The removal was permitted because Enstar's complaint included a claim under federal law, the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.,* along with state law claims, alleging breach of fiduciary duty and misrepresentation. Grassgreen asserted a counterclaim against Enstar alleging breach of contract and misrepresentation based on Enstar's refusal to pay him benefits under the Executive Benefit Agreement and the SERP.

Enstar eventually settled its claims against Mendel for $4,500,000.00, in addition to the $295,000.00 previously paid. Enstar then proceeded to trial against Grassgreen. At the close of its case, Enstar moved to dismiss its RICO claim subject to the court retaining jurisdiction over the remaining state law claims. The court then dismissed the RICO claim and retained jurisdiction over the state law claims. At the close of trial the jury returned a verdict finding Grassgreen liable for both compensatory and punitive damages and finding in favor of Enstar on Grassgreen's counterclaim. The jury set compensatory damages in the amount of $1,947,549.69,[10] and punitive damages in the amount of $18,000,000.00, for a total of $19,947,549.69.

At the time of trial, Enstar was in bankruptcy.

## II. THE OFFICER/DIRECTOR'S RELATIONSHIP TO THE CORPORATION

Grassgreen was an officer and director of Enstar (previously Kinder–Care) at the time the actions complained of took place. The first step, therefore, in determining the issues presented is to consider the nature of that relationship.

 Corporate directors and officers have been variously described as trustees, fiduciaries, and agents of their corporation and stockholders. As such, they owe their corporation complete loyalty, honesty, and good faith; their first duty is to act in all things of trust wholly for the benefit of the corporation, and this encompasses a duty to disclose information to those who have a right to know the facts. *See Fletcher Cyc Corp § 838 (Perm Ed),* and numerous cases cited therein.

In *Belcher v. Birmingham Trust National Bank,* 348 F.Supp. 61 (N.D.Ala 1968), Judge Grooms described the relationship as follows:

Although not technically trustees, the duties of officers and directors are analogous to those of trustees. They are required to act with fidelity and good faith, *subordinating their personal interests*

---

**10.** Compensatory damages included the following transactions and amounts: Coastal—$105,000.00; Unocal—$225,000.00; Pantry Pride—$112,500.00; Pacific Lumbar—$50,000.00; GAF—$225,000.00; Midcon $202,500.00; Cohen Feit—$430,731.00; Mayer, Brown's legal fees—$260,394.72; Grassgreen's reimbursed legal fees—$68,552.23; and Grassgreen's advance on bonuses—$267,871.74

*to the interests of the corporation ... They occupy a quasi fiduciary relation to the corporation and its stockholders.* (Citations omitted; emphasis added)

The Supreme Court of Alabama in *Jones v. Ellis*, 551 So.2d 396, 401 (1989) quoted from *Belcher* with approval and quoted further from its earlier case of *Holcomb v. Forsyth*, 216 Ala. 486, 113 So. 516 (1927) as to the role of corporate directors:

... The entire management of corporate affairs is committed to their charge, upon the trust and confidence that they shall be cared for and managed within the limits of the powers conferred by law upon the corporation and for the common benefit of the stockholders. *They are required to act in the utmost good faith, and in accepting the office they impliedly undertake to give to the enterprise the benefit of their best care and judgment, and to exercise the power conferred solely in the interest of the corporation.* Clothed with the power of controlling the property and managing the affairs of the corporation, without let or hindrance, as to third persons, they are agents, *but, as to the corporation itself, equity holds them liable as trustees.*

*Fletcher* states that, "The unbending rule is that the director must act in the utmost good faith, and this good faith forbids placing himself in a position where his individual interest clashes with his duty to his corporation." *Fletcher Cyc Corp § 838, P. 181 (Perm Ed).*

These are not obscure rules of law that must be found by lawyers and judges for the purposes of lawsuits. They are basic concepts of our economic system which are known, or instinctively assumed, by all who participate in it. They are there for the protection of all who answer the invitation to invest their money in corporate America. Whether it be a seasoned investor of private funds, a manager of the investment of retirees' pension funds, or an unsophisticated occasional investor of small sums who hopes that the free enterprise system will provide for a better future, the investor assumes that these rules will be followed.

The free enterprise system does not guarantee success in business, and neither does it guarantee that investing one's funds in the stock of a corporation will be risk free. An investment in stock assumes the many risks of the marketplace, from changes in technology, to losing out to competition, to problems resulting from bad business decisions by poor, but honest, management. One risk which the investor should not assume, however, is that the officers and directors who have accepted the responsibility of using that investor's money might put their personal interests ahead of that of the corporation. For this country's economic system to work in the area of corporate investment, the investor must be assured that the corporation's officers and directors will put the interests of the corporation first and that their decisions will not be clouded in any way by competing personal interests. If an officer and director violates that trust which is placed in him, and breaks the rules which govern his position of trust, the law requires that he must answer for that breach.

## III. THE BREACH

Richard Grassgreen breached his duty as an officer and director by placing his personal interests ahead of the interests of his corporation.

In 1985 and 1986, Grassgreen was Kinder–Care's Executive Vice President and then its President and Chief Operating Officer, as well as being a director. He also served as the corporation's investment manager. With millions of dollars of corporate funds available for investment, he was the person who decided where those funds should go. The law required him to make those decisions wholly for the benefit of the corporation, with no thought to personal gain. That rule was part of the bargain which investors made when they bought stock in the corporation, and that is the rule which Grassgreen consciously broke.

On several different occasions, Grassgreen was paid money, and kept it personally, in exchange for investing, or at least

committing to invest, the corporation's funds in junk bonds sold to finance corporate takeovers. On other occasions, he was able to take personal advantage of lucrative investment opportunities because of his handling of the corporation's funds.

Investing corporate funds in junk bonds with high interest rates certainly may be a legitimate act by an investment manager. It is the manager's duty, however, to see that his corporation receives the full benefit of the transaction, and this would include fees paid for making a commitment to invest the corporate funds. The president of a corporation has no more right to personally receive hundreds of thousands of dollars for commitments to invest millions of his corporation's dollars than the company's purchasing agent has to take kickbacks from a firm from whom he buys supplies. The principle is the same: the person's duty to the corporation must be exercised without thought of personal gain. A jury found that Grassgreen breached that duty, and the court has previously ruled that there was sufficient evidence to justify that finding. The court must now consider the issues which remain.

## IV. EQUITABLE ISSUES

Two equitable claims remain for resolution, claims which the parties agreed were not claims for which a right to a jury trial existed. These are Enstar's claim for forfeiture and recovery of compensation paid to Grassgreen and Enstar's claim for the amount received by Megra from the sale of stock in THL Industries, Inc. The court has determined these issues on the basis of the evidence produced and facts found at the jury trial and facts found from evidence submitted at a subsequent hearing on May 21, 1992.

### A. Forfeiture and Recovery of Compensation

Enstar claims that Grassgreen should be required to forfeit and repay all compensation which he received from Enstar during the period following his initial misappropriation of commitment fees that rightfully belonged to the corporation, in March,

1985, and up to the time he was forced to resign in October, 1990.

Because of the legal principles discussed above, cases have held that a corporate officer is not entitled to compensation for services during a period in which that officer engages in activities constituting a breach of the officer's duty of loyalty to the corporation. Accordingly, an officer who is found to have engaged in such conduct may be required to forfeit all compensation which he received during such time, including salary and bonuses.

The *Restatement of Agency, 2nd*, § 469, states the rule as follows:

> An agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty; if such conduct constitutes a wilful and deliberate breach of his contract of service, he is not entitled to compensation even for properly performed services for which no compensation is apportioned.

Comment (e) to *Restatement*, Rule 469, says, "If the principal, in ignorance of the agent's faulty conduct, pays to the agent compensation or indemnity to which he is not entitled, the principal can maintain an action to recover the amount." *See also, Fletcher Cyc Corp § 2145 (Perm Ed)*, and cases cited therein.

The evidence clearly established that Grassgreen was in breach of his duties to the corporation during the entire time from March, 1985, until he resigned in October, 1990.

#### Fiscal Year Ending 8/30/85

Megra's March, 1985, commitment to purchase $20,000,000 of Coastal's securities produced a $150,000 commitment fee to Megra, which Grassgreen had Megra keep, despite the fact that Kinder–Care purchased $14,000,000 of the securities and Megra contributed only $6,000,000. Grassgreen did not advise the Board of Directors of this.

Megra received a commitment fee of $225,000 for its April, 1985, commitment to purchase $30,018,000 of Unocal securities. The jury found as a fact, and the court

agrees, that Grassgreen never intended for Megra to fund this commitment itself, but that he intended to use corporate funds to fulfill this commitment. Grassgreen had Megra keep this fee, and he did not advise the Board.

During this year, Grassgreen was Kinder-Care's Executive Vice President, Director, and investment manager. Salary, bonus, and other compensation prorated from the time of the Coastal transaction to the end of the fiscal year totalled $289,170.

### Fiscal Year 9/1/85—8/29/86

Grassgreen was elevated to President and Chief Operating Officer on October 10, 1985, with the corporation's Board of Directors being unadvised that he was being paid fees personally for committing to invest corporate funds. He was allowed to continue as investments manager.

In October, Grassgreen induced Kinder-Care, through its subsidiary, Care Investors, to commit $36,000,000 to Cohen Feit. This allowed Megra to eventually receive $430,000 in the form of a general partner's override because of its position as a limited partner in Cohen Feit South. At the trial, Grassgreen contended that he advised the corporation's board of Megra's right to the override. The jury's verdict showed that it disbelieved him. The court also disbelieves this testimony and finds as a fact from the evidence presented that Grassgreen suppressed this fact and never told the Board that Megra was being paid money because of this investment of corporate funds.

In November and December, 1985, Grassgreen collected additional commitment fees based upon commitments which he had made with the intent to invest Kinder-Care funds. He had Megra keep these fees and did not advise the Board.

In January, 1986, Grassgreen took advantage of an investment opportunity in Storer warrants through MacPherson Partners. He was given this opportunity because of his investments of corporate funds through Drexel. He made this investment from commitment fees which belonged to Kinder-Care, and never advised the Board of this transaction.

In March, 1986, Grassgreen invested $165,000 of the commitment fees, which rightfully belonged to Kinder-Care, in the common stock of THL Industries, Inc. This stock was later sold for $751,460. Grassgreen never advised the Board about this investment.

During this fiscal year, Grassgreen's salary, bonus, and other compensation totaled $892,888.

### Stub Year Ending 12/31/86

In 1986, Kinder-Care changed from a fiscal year to a calendar year. During the period from August 30, 1986, to December 31, 1986, Grassgreen never advised Kinder-Care's board or its stockholders of Megra's entitlement to the override from Cohen Feit South, or of the commitment fees, or of the investments of commitment fees in MacPherson and THL. During this period, Grassgreen caused the company to invest additional funds in the amount of $15,000,000 in Cohen Feit through the company's subsidiaries, Care Investors, Inc. and Pioneer Western, Inc.

Grassgreen's salary and bonus for this period totaled $56,077.

### Calendar Year Ending 12/31/87

During this year, the corporation's funds remained invested at risk in Cohen Feit, and Grassgreen continued his suppression from Kinder-Care's Board of Directors and stockholders of his self-dealing. The Board remained ignorant of the fact that its president, director, and investments manager had personally benefitted from his handling of corporate funds and had a substantial personal interest in a large continuing investment. During that year, the corporation paid Grassgreen in salary, bonus, and other compensation a total of $713,357.

### Calendar Year Ending 1988

The company's funds remained at risk in Cohen Feit during 1988, and Grassgreen continued to suppress his acts from Kinder-Care's Board of Directors and stockholders. He also continued, as in previous

years, to fail to disclose his conflicts in SEC filings.

Further, on December 30, 1988, in order to obtain a distribution of funds from Mac-Pherson, Grassgreen represented to Mac-Pherson that he had revealed Megra's investment in MacPherson to Kinder–Care's Board and that he had obtained the consent of the Board to make the investment. This representation was false. Grassgreen had not revealed this to the Board in the past and continued not to do so even while telling MacPherson that he had.

During this year in which Kinder–Care's Board and stockholders were kept ignorant of Grassgreen's self-dealing, Grassgreen was allowed to continue his service as an officer and director and was paid salary, bonus, and other compensation in the total amount of $1,129,193.

### Calendar Year 1989

Grassgreen continued throughout 1989 to withhold from the Board, the stockholders, and the SEC any information concerning his self-dealing.

In January, 1989, Megra received a distribution from MacPherson of $337,080, and in April, 1989, another distribution of $337,080 was received. Grassgreen did not advise the Board of these receipts.

In February, 1989, Megra received payment from Cohen Feit South of $432,301 as an override resulting from the investment of Kinder–Care funds. Grassgreen kept the money in the Megra account and did not advise his corporation's board.

During the year 1989, the corporation paid Grassgreen salary, bonus, and other compensation in the total amount of $1,730,434.

### Calendar Year 1990

In January, 1990, Enstar's board became aware of Megra's investment in MacPherson, not because Grassgreen disclosed this information, but as a result of the U.S. Attorney's investigation. This prompted the special counsel investigation.

Grassgreen misrepresented the facts to the corporation's special counsel during the

investigation. Furthermore, the court finds as a fact from the evidence that Grassgreen concealed from the investigators records which would have reflected the payment of commitment fees to Megra by Drexel.

During 1990, while Grassgreen was not only failing to disclose information regarding his self-dealing, but was actively misrepresenting the facts and concealing evidence, and before he was allowed to resign in October instead of being fired, the corporation paid Grassgreen salary and bonus totalling $654,416.

■ Grassgreen argues that, although the law allows for some forfeiture, he should not be required to forfeit bonuses, because bonuses were based on the profits which the company made under his leadership. He also contends that it would not be equitable to require a total forfeiture of compensation because, regardless of what he may have done wrong, he worked diligently on behalf of the corporation and the corporation profited from his work.

The Tenth Circuit Court of Appeals addressed the question of total versus partial forfeiture in the case of *Wilshire Oil Company of Texas v. Riffe*, 406 F.2d 1061 (1969). Even though the corporate officer there argued that he should not have to forfeit everything in view of the fact that the corporate division for which he was responsible made money during the period in question, the court required him to forfeit all compensation, both salary and bonus, noting that an agent who acts for his own benefit is not entitled to compensation which otherwise would be due him, even though his acts may not actually harm his principal and even if he thinks his actions will benefit the principal. The Court said:

> When a corporate officer engages in activities which constitute a breach of his duty of loyalty, or if it is a wilful breach of his contract of employment, he is not entitled to compensation for services during such period of time although part of his services may have been properly performed.

The Illinois Court of Appeals, in the case of *ABC Trans Nat. Transport, Inc. v. Aeronautics Forwarders, Inc.*, 90 Ill. App.3d 817, 46 Ill.Dec. 186, 413 N.E.2d 1299 (1980), expressed the reason for requiring total forfeiture as follows:

The confusion over 'total' versus 'partial' salary forfeiture, as expressed in the apportionment principle, is eliminated by the recognition that within the actual period of tortuous conduct, salary forfeiture is required because the agent's services are not being 'properly' performed. The agent retains compensation rightfully earned before the breach, for specific periods. As a matter of public policy as expressed in the above cases, however, one who breaches fiduciary duties has no entitlement to compensation during a willful or deliberate course of conduct adverse to the principal's interest.

Grassgreen portrays his conduct as having caused very little, if any, actual damage to the corporation. He points out that the corporation did not lose money on any of the investments for which he received personal commitment fees, but, in fact, made money. He also points out that all of these commitment fees have now been paid over to the corporation. Accordingly, he says that it would be grossly inequitable for the corporation to receive his services for the entire period of time in question without paying him any compensation whatsoever for those services.

Grassgreen's argument ignores the basic reasons behind the rules of law involved in this issue. Damage to the corporation is not required to be shown, because it is not relevant to this issue. Who knows what would have happened to this corporation if Grassgreen had honestly fulfilled his duty to put the corporation, rather than himself, first? Could he, perhaps, have found more profitable investments if he had not been personally paid money for making the ones he did? If the commitment fees had been paid to the corporation at the time they were paid to Megra, rather than years later, would the corporation have been able to change its economic future? We know that the corporation is now in bankruptcy. Enstar did not attempt to prove at trial that its bankruptcy was caused by these wrongful acts of Grassgreen. This would certainly require speculation. If Grassgreen had been a faithful servant to his corporation, however, such speculation would not even arise.

Grassgreen cites the court to the case of *Belcher v. Birmingham Trust National Bank*, 348 F.Supp. 61 (N.D.Ala.1968), where Judge Grooms noted that, "Forfeitures are not favored and are to be avoided when possible," held that the rule requiring forfeiture of compensation during a period of breach by a corporate officer is not so inflexible as to leave no room for the exercise of judicial discretion, and refused to require a forfeiture of compensation.

 This court agrees with Judge Grooms that there is room for judicial discretion in this matter, as he noted in his quotation from the Supreme Court of Pennsylvania opinion in *Appeal of Biddle*, 129 Pa. 26, 18 A. 474, 475 (1889):

Fortunately, there is no unbending rule which a court of equity is bound, under all circumstances, to apply in cases of this kind; but that may be done which in good conscience ought to be done in each particular case.

This court considers it to be of crucial importance to the economic well-being of this country for corporate officers and directors to understand without question that in the discharge of the duties of their offices they must subordinate their personal interests to the interests of the corporation which they serve. This court will not hesitate to enforce that duty as forcefully as is possible. It is not a duty concerning which there should be any equivocation.

Richard Grassgreen breached his duty flagrantly. He elected to profit personally by the way in which he invested the funds of his corporation, which he held in trust. He did so in secret, without advising his Board of Directors and stockholders, who were paying him well and who had the right to assume that he was making all investment decisions wholly in the interest of the corporation and without any thought to personal gain. Grassgreen was in

breach of the duties which he owed to his corporation from the time he initially decided to put his personal financial interests first and keep his corporation ignorant of that fact, in 1985, until he was forced to resign in 1990 as a result of his fraudulent activities.

In the exercise of its discretion based on all the circumstances presented by the evidence in this case, the court is of the opinion that Richard Grassgreen should forfeit all salary, bonuses, and other compensation which were paid to him by his corporation while he was in breach of his duties. This totals $5,465,535. The jury included in its verdict the amount of $267,871.74 which Grassgreen received in 1990 as an advance on his bonus for that year. This amount should not be included again here, but should be deducted from the total amount of salary and bonuses to be forfeited. Therefore, the court will enter judgment against the Defendant on the Plaintiff's claim for forfeiture and recovery in the amount of $5,197,663.30.

### B. THL Industries

In March, 1986, Grassgreen took commitment fees which he had deposited in the Megra account and bought common stock in THL Industries, Inc., the name of which was later changed to Hill's Department Stores. The stock was issued to Megra and was sold in 1990 for a profit. Enstar claims that it is entitled to the profit, since the stock was bought with money which rightfully belonged to it. The court finds as a fact from the evidence that the stock was purchased with commitment fees.

Grassgreen first disputes the amount of the gain. He contends that the stock cost $230,000 and was sold for $664,954.50, producing a gain of $434,954.50. In support of that contention, he submitted a schedule from Megra's 1990 income tax return. Enstar introduced copies of Drexel's Statements of Account on Megra showing a purchase price of $165,000 and a sales price of $751,461, producing a gain of $586,461.

The court accepts the Statements of Account as accurate, finds that Grassgreen's tax return is inaccurate, and finds as a fact that Megra realized a gain of $586,461 on the sale of the stock.

■ Grassgreen next contends that, whatever the amount of the gain on the sale of this particular stock, he should not be required to pay it to Enstar because there were losses on other investments made with commitment fees. He argues that any profits must be reduced by losses in the Megra account. The court rejects this contention.

■ Grassgreen held the commitment fees in constructive trust for his corporation. *See Beasley v. Mellon Financial Services Corp.*, 569 So.2d 389 (Ala.1990). A trustee is not allowed to offset losses against gains in regard to his liability for breaching his trust. As pointed out in *Bogert on Trusts*, § 708:

> If a trustee makes several improper investments, the beneficiary may elect to ratify one or more and to reject the others.

*Bogert* goes on to give as an example:

> And, if a trustee makes ten lawful trust investments with a net gain to the principal of $1,000, and one improper trust investment by reason of which $1,000 of trust principal and income are lost, the trustee will not be permitted on his accounting to strike a balance and escape all liability.

On this point, the court adopts the following Comment from the *Restatement of Trusts, 2d*, § 213:

> Thus, if the trustee improperly invests part of the trust funds in securities which he sells at a profit and improperly invests another part of the trust funds in other securities which he sells at a loss, the beneficiary can accept the transaction on which there was a profit and reject that on which there was a loss; he can compel the trustee to account for the profit on the former securities and charge the trustee with the loss on the latter securities.

Also, according to the *Restatement of Trusts, 2d*, § 205:

If the trustee commits a breach of trust, he is chargeable with

. . . . .

(b) any profit made by him through the breach of trust;

. . . . .

Grassgreen is liable to his corporation for the profit he made personally on this investment of funds which rightfully belonged to the corporation. *See Marcus v. Otis,* 83 F.Supp. 893, 895 (D.C.N.Y.1949); and *Equity Corporation v. Groves,* 294 N.Y. 8, 60 N.E.2d 19 (1945). Judgment will be entered in favor of the Plaintiff on this claim in the amount of $586,461.

## V. INTEREST IN MACPHERSON PARTNERS

In 1985, Grassgreen invested money from commitment fees for an interest in MacPherson Partners. Grassgreen and Mendel have previously paid over to the corporation distributions which they received from this investment, and they have agreed to transfer to Enstar all of their interest in MacPherson. An order recognizing and enforcing that agreement will be included in the judgment in this case.

## VI. PREJUDGMENT INTEREST

■ At the trial of this case, the parties agreed that the matter of prejudgment interest would not be submitted to the jury, but would be determined by the court in the event of a Plaintiff's verdict. At a post-trial hearing held on May 21, 1992, the parties agreed to the amount of prejudgment interest which should be added to damages, with the exception that the Defendant objected to the inclusion of any interest in regard to the MacPherson Partners transaction.

Grassgreen and Mendel received $337,080 from MacPherson on January 31, 1989, and $337,080 on April 17, 1989. They paid Enstar $674,160 on June 1, 1990. The interest in dispute is interest on this money from the time in 1989 when the money was received until June 1, 1990, when the money was paid to Enstar. It was agreed that

this amount of interest in dispute totaled $49,481 through April 23, 1992.

Grassgreen objects to paying interest for the time Megra held the MacPherson distributions, because he contends that this money did not actually belong to Enstar and that he paid it over to Enstar voluntarily. The court does not agree. The interest in MacPherson Partners was offered to Grassgreen and Mendel by Michael Milken because of their large commitments and investments of Kinder–Care money with him. Arguing that this investment opportunity was not offered to the corporation, as Grassgreen does, begs the question. It was a "reward", "gratuity", or "tip" for the way Grassgreen was handling corporate investments. Furthermore, the MacPherson investment was made with commitment fees which rightfully belonged to the corporation. The distributions received by Megra belonged to the corporation and Grassgreen is liable for interest on those distributions while he held them.

Having found that Enstar is entitled to interest on the MacPherson transaction, the amount of prejudgment interest will be set as agreed by the parties at the May 21, 1992 hearing. This agreed amount was $495,246 through April 23, 1992, plus $184 per day thereafter until the date of judgment. Daily interest for 291 days, from April 23, 1992, to the date of this order, February 9, 1993, amounts to $53,544. Therefore, judgment will be entered for interest, which on this day totals $548,790.

## VII. PUNITIVE DAMAGES

The jury assessed punitive damages against Grassgreen in the amount of $18,000,000. By post-trial motion, Grassgreen attacks this award on two grounds. First, he contends that punitive damages in this case are limited by the statutory cap of $250,000 contained in § 6–11–21, *Alabama Code.* Second, he contends that, if the statutory cap does not apply, the award was excessive and should be reduced or a new trial granted.

The court set an evidentiary hearing on the question of punitive damages in accordance with the provisions of § 6–11–23(b),

*Alabama Code*, and the hearing was held on May 21, 1992. The court has considered the evidence presented at that hearing, together with briefs and oral argument presented by the parties.

### A. *Statutory Cap*

Section 6–11–21, *Alabama Code*, provides as follows:

> An award of punitive damages shall not exceed $250,000, unless it is based upon one or more of the following:
>
> (1) A pattern or practice of intentional wrongful conduct, even though the damage or injury was inflicted only on the plaintiff; or
>
> (2) Conduct involving actual malice other than fraud or bad faith not a part of a pattern or practice; or
>
> (3) Libel, slander or defamation.

Enstar contends that punitive damages are not limited to $250,000 in this case, because the first exception, a pattern or practice of intention wrongful conduct, was proved. Grassgreen contends that a pattern or practice was not proved and that the limitation applies. The burden of proving the exception was on Enstar.

Grassgreen argues that the same type pattern required by the federal courts in interpreting the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961(5), must be proved to establish the exception provided by this statute. He cites *Youngblood v. Lawyers Title Ins. Corp.*, 746 F.Supp. 71 (S.D.Ala.1989), rev'd on other grounds, 923 F.2d 161 (11th Cir. 1991). He then argues that this was not proved and that the Plaintiff recognized that by dismissing its RICO claim at the close of the evidence.

This court finds it unnecessary to analyze the statutory provisions and court decisions dealing with the "pattern" requirement of RICO. While such an analysis may be helpful, it is not required. The court notes that the Eleventh Circuit, in a RICO case, has held that, "Conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Durham v. Business Management Associates*, 847 F.2d 1505, 1512 (11th Cir.1988). That definition certainly seems to fit this case. The question, however, is not whether the Plaintiff proved a RICO case, but whether the Plaintiff proved "a pattern or practice of intentional wrongful conduct." Giving those words their common, ordinary meaning, the court finds that this was clearly proved.

There is no question that Grassgreen engaged in intentional wrongful conduct. He intentionally violated his position of trust as an officer and director of his corporation in order to obtain personal financial gain. He intentionally failed to disclose this to his Board of Directors and stockholders and, in fact, attempted to conceal the activity. He committed several acts at different times of improperly accepting commitment fees for committing and investing corporate funds, and he took advantage of investment opportunities which were presented to him because of his use of corporate funds. These acts all had similar purposes and results, that is, to personally enrich Richard Grassgreen. They involved the same participants, that is, Grassgreen, Mendel, and Megra on the one hand and Michael Milken and Drexel on the other, and the same victims, Kinder–Care and its stockholders. Furthermore, Grassgreen then pursued a pattern of similar acts in attempting to conceal this activity. He suppressed this information continuously for several years, he misrepresented the facts to investigators and to Board members, and he concealed documents which were evidence of the improper receipt of commitment fees.

The court finds as a fact, established overwhelmingly by the evidence, that Grassgreen engaged in a pattern or practice of intentional wrongful conduct. Therefore, the exception to § 6–11–21, *Alabama Code*, has been proved and punitive damages in this case are not limited to $250,000.

### B. *Excessiveness of Award*

Grassgreen contends that the jury award of $18,000,000 in punitive damages

is grossly excessive and that it should be substantially reduced or a new trial should be granted. He filed a post-trial motion asking the court to conduct a hearing concerning the amount of punitive damages in accordance with § 6–11–23(b), *Alabama Code*. Section 6–11–23(b) provides as follows:

> (b) In all cases ·wherein a verdict for punitive damages is awarded, the trial court shall, upon motion of any party, either conduct hearings or receive additional evidence, or both, concerning the amount of punitive damages. Any relevant evidence, including but not limited to the economic impact of the verdict on the defendant or the plaintiff, the amount of compensatory damages awarded, whether or not the defendant has been guilty of the same or similar acts in the past, the nature and the extent of any effort the defendant made to remedy the wrong and the opportunity or lack of opportunity the plaintiff gave the defendant to remedy the wrong complained of shall be admissible.... After such post verdict hearing, the trial court shall independently (without any presumption that the award of punitive damages is correct) reassess the nature, extent and economic impact of such an award of punitive damages, and reduce or increase the award if appropriate in light of all the evidence.[11]

This hearing was held and both parties were given the opportunity to present all evidence which they considered to be relevant to this issue.

In *Pacific Mut. Life Ins. Co. v. Haslip,* — U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), the Supreme Court approved the procedures established by the Alabama Supreme Court for review of a jury's award of punitive damages. These procedures are set out in *Hammond v. Gadsden,* 493 So.2d 1374, 1379 (Ala.1986), and *Green Oil Co. v. Hornsby,* 539 So.2d 218, 223–24 (Ala. 1989).

▮▮ A jury is given much discretion in setting an amount of punitive damages, but that discretion is not unlimited. Both the Alabama legislature and the Supreme Court of Alabama, in a manner approved by the Supreme Court of the United States, have mandated an independent review of an award of punitive damages which is attacked as excessive. As stated in *Green Oil,* 539 So.2d at 222:

> Because the purpose of punitive damages is not to compensate the plaintiff but to punish the wrongdoer and to deter the wrongdoer and others from committing similar wrongs in the future, the proper amount of punitive damages rests largely within the jury's discretion. However, although punitive damages need bear no particular relationship to actual damages, they, nonetheless, must not exceed an amount that will accomplish society's goals of punishment and deterrence.

▮▮ This court, then, must determine whether, under the evidence presented in this particular case, the sum of $18,000,000 exceeds an amount that will both punish Richard Grassgreen and deter him and other officers and directors of corporations from committing similar wrongs in the future. To assist in making that determination, *Green Oil* set out the following factors which might be taken into consideration:

> (1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the actual or likely harm is slight, the damages should be relatively small. If grievous, the damages should be much greater.
>
> (2) The degree of reprehensibility of the defendant's conduct should be considered. The duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or "cover-up" of that hazard, and the existence and frequency of similar past

---

11. The Supreme Court of Alabama has held that portion of the statute which negates any presumption that the award of punitive damages is

correct to be unconstitutional. *Armstrong v. Roger's Outdoor Sports, Inc.,* 581 So.2d 414 (Ala. 1991).

conduct should all be relevant in determining this degree of reprehensibility. (3) If the wrongful conduct was profitable to the defendant, the punitive damages should remove the profit and should be in excess of the profit, so that the defendant recognizes a loss. (4) The financial position of the defendant would be relevant. (5) All the costs of litigation should be included, so as to encourage plaintiffs to bring wrongdoers to trial. (6) If criminal sanctions have been imposed on the defendant for his conduct, this should be taken into account in mitigation of the punitive damages award. (7) If there have been other civil actions against the same defendant, based on the same conduct, this should be taken into account in mitigation of the punitive damages award.

The court has considered all of these factors.

### 1. Harm

The evidence established specific harm that was caused to the corporation by having fees which were given for commitments of its funds paid to Grassgreen, rather than to the corporation. Also, specific profits which could have gone to the corporation went to Grassgreen. Thus, the corporation was harmed by not having this money available, and that harm was certainly not slight.

The Defendant argues that none of the investments he made which involved commitment fees lost money and that this shows no harm. That may be true, but it does not take into account whether more profitable investments might have been made if Grassgreen had not been influenced by being paid to invest corporate funds where he did. As previously discussed, the full extent of the harm caused by Grassgreen can never be known. A once flourishing corporation is now in bankruptcy. While the plaintiff did not attempt to prove that this was caused by Grassgreen's acts, it cannot be ignored that for over five years this corporation was run by an individual who was putting his own self-interest ahead of his duties to the corporation. It is this fact, as much as any specific act, that causes the court to find that harm to the corporation was grievous.

### 2. Reprehensibility

Grassgreen's conduct was truly reprehensible. He evinced an arrogant and callous disregard for his duties as president and director of his corporation. Rather than giving his corporation the benefit of commitment fees and lucrative investment opportunities, or of honestly telling his directors about these dealings and seeking their approval, he secretly took the money for himself. While those who invested their money as stockholders in Kinder–Care had the right to assume that their executive vice president and later president was running their corporation wholly for their best interests, as the law requires, he was actually taking hundreds of thousands of dollars "under the table" in exchange for directing millions of the corporation's dollars to speculative investments with Michael Milken.

The court cannot say that the Defendant was aware of the hazards which his conduct caused or was likely to cause, although he was certainly aware that the money was going to him, rather than to his corporation. In one way this might mitigate somewhat against the reprehensibility of the Defendant's conduct. On the other hand, however, the evidence is clear that Grassgreen consciously put his personal interest ahead of that of his corporation, and if he was unaware that this in itself, regardless of any specific acts committed because of it, posed grave risks of hazard to his corporation, this militates against him.

Grassgreen's concealment or "cover-up" of his conduct was extensive. He used Kinder–Care's tax number instead of his own; he did not report the commitment fees as income on his tax returns; he falsely told special counsel and members of the Board that no commitment fees had been received; he misrepresented to MacPherson Partners, in order to obtain a distribution, that he had made full disclosure to Kinder–Care; he failed to reveal to special counsel that the investments in MacPher-

son Partners and THL Industries had been made with corporate funds and that he had profited personally from those investments; he destroyed or concealed statements from Drexel which would have shown the commitment fees; he attempted to conceal the Megra account and transfer its assets to another account after it was announced that Drexel would probably plead guilty to criminal charges and cooperate with the Government investigation; and he testified falsely at trial regarding such matters as his intention to fund the Unocal commitment with corporate funds and his failure to advise the Board that Megra would make money on the corporation's investment in Cohen Feit because of the override provided to Megra as a partner in Cohen Feit South.

The court finds the degree of reprehensibility of Grassgreen's conduct to be great.

### 3. Profitability from Wrongful Conduct

The evidence showed profits to Megra, including commitment fees, distributions from MacPherson, profit from THL stock, of approximately $2,600,000. Therefore, Grassgreen received approximately $1,300,000 in profit from his wrongful conduct.

### 4. Financial Position of Defendant

■ In *Green Oil*, the Supreme Court of Alabama quoted with approval a concurring opinion of Justice Jones in *Ridouts–Brown Service, Inc. v. Holloway*, 397 So.2d 125 (Ala.1981), which included the following statement:

> We are all in agreement that the award in the instant case ought to be large enough to hurt. It ought to sting in order to deter; that is its purpose. But only in the rarest of cases should it be large enough to destroy; this is not its purpose.

Thus, the financial position of the defendant is to be considered in determining the amount of damages necessary to punish the particular defendant, which is then weighed along with the gravity of the wrongful act to determine what amount will accomplish the ultimate purpose of punitive damages.

The concept that an award of punitive damages should be large enough to hurt, but only rarely large enough to destroy, is easier to say than, in some cases, to apply.

Grassgreen is burdened with a very large award of compensatory damages. The jury verdict against him on his counterclaim means that he will not receive retirement benefits from Enstar.

At the evidentiary hearing, Grassgreen presented evidence intended to show that his financial condition had deteriorated greatly from June 30, 1990, when on a financial statement he showed his net worth to be $26,962,000, to the date of the hearing when he estimated his net worth to be a little over $3,000,000. Part of the reduction was explained by the fact that the 1990 financial statement showed Enstar stock, which is now valueless, at a value of $5,500,000. The greatest reduction, however, was the deletion of an investment in TransResources, Inc. which was valued by Grassgreen in 1990 at $20,000,000. The Plaintiff presented evidence that tended to show that, through a series of transactions involving Grassgreen's wife and related companies, this stock has, in effect, been converted into an investment now held in the name of Grassgreen's wife which will provide periodic payments to Mr. and Mrs. Grassgreen over the next 14 years in excess of $19,000,000. Without analyzing the effect of those transactions on creditors of Grassgreen, the court finds that, at the very least, this evidence shows efforts on Grassgreen's part to shield assets. The court does not consider Grassgreen's testimony concerning his financial position to be credible. That being the case, the court is unable to determine just what the financial position of the Defendant is.

■ It certainly seems highly possible that a punitive award in the amount of $18,000,000, when added to compensatory damages, would exceed Grassgreen's net worth. If Grassgreen's testimony as to his net worth were to be believed, however, the compensatory damages in this case alone would exceed his net worth. If that is the case, then punitive damages in whatever amount will neither hurt nor destroy. It

cannot be said because of that, however, that no punitive damages are in order. The financial position of the Defendant, whatever that might be, remains only one of the many factors which the court has considered on the question of what amount of punitive damages is appropriate under all the circumstances in this case.

### 5. Costs of Litigation

Evidence was not submitted of the actual cost of this litigation to the Plaintiff. So, while the court knows from experience and may consider that the costs were considerable, there is no specific amount to consider.

### 6. Criminal Sanctions

■ Substantial criminal sanctions imposed for the wrongful conduct would mitigate against punitive damages. That did not happen in this case. After entering a guilty plea as a part of a plea bargain in which Grassgreen agreed to testify for the Government in a criminal case against Michael Milken in New York, the federal court in New York sentenced Grassgreen to 90 days imprisonment. He served that time in a half-way house in Montgomery.

The Defendant has argued that the light sentence he received is evidence that his conduct was not a serious offense. This court disagrees and attributes the lightness of the sentence to the fact that the New York court was rewarding Grassgreen for helping to convict Milken, and also to the fact that the New York court did not have the benefit of all of the evidence which is before this court showing the egregiousness of Grassgreen's breach of trust.

The court finds that Grassgreen has received very little punishment for his conduct in the form of criminal sanctions.

### 7. Other Actions

Other actions are pending against Grassgreen by stockholders and others relating to the conduct made the basis of this suit. These other actions also involve other defendants. The results of these other actions cannot be foretold. If the Plaintiffs are successful in any of these suits, part or all of any judgments might be paid by codefendants. Also, the judgment in this case might be considered by other courts in the event of a punitive damage award against Grassgreen in any of the other cases. There have been no other cases, however, in which Grassgreen has paid damages, either compensatory or punitive, based on the same conduct as that involved in this suit.

### Other Factors

In addition to the matters referred to in § 6–11–23, *Alabama Code,* and *Green Oil,* the court has considered the matter of the relationship of punitive damages to compensatory damages. The question of whether proportionality is required in order for a punitive damage award to withstand a constitutional challenge of denial of due process is the subject of much discussion and debate, particularly following the Supreme Court's decision in *Haslip.*[12]

*Haslip,* —— U.S. at ——, 111 S.Ct. at 1046, stated:

> We are aware that the punitive damages award in this case is more than four times the amount of compensatory damages, is more than 200 times the out-of-pocket expenses of respondent Haslip.... While the monetary comparisons are wide and, indeed, may be close to the line, the award here did not lack objective criteria.

The Defendant argues that, because of the decision in *Haslip,* punitive damages in this case may not exceed four times the compensatory damages. The Plaintiff contends that *Haslip* does not mandate such a limitation. The parties disagree greatly over what figure should be multiplied by four in the event this formula were used.

Compensatory damages of approximately $1,950,000 were awarded by the jury. Multiplying that by four would be $7,800,000. The Plaintiff has argued that prejudgment interest and the THL Industries profit should be added to the jury's compensatory damages award. This would make total

---

**12.** Legislatures in several states are also considering statutory limits on punitive damages in the form of multiples of compensatory damages.

compensatory damages of approximately $3,000,000 which, when multiplied by four, would total $12,000,000. Enstar also argues that the distributions from MacPherson in the amount of $674,000 should be considered and multiplied by four, producing another $2,696,000. If it were appropriate to add amounts not included in the compensatory damages awarded by the jury to arrive at the compensatory damages figure to be multiplied by four, it would also be appropriate to add the $5,197,663.30 forfeiture of compensation awarded by the court. If that were done, the punitive damage award would be less than four times compensatory damages.

The Defendant contends that nothing should be added to the jury's compensatory damage award, but that that award should be reduced by various credits in order to arrive at an appropriate figure to be multiplied by four. The court does not agree with this approach. The same language in *Haslip* which the Defendant uses to argue for a multiple of four approved a punitive award which was more than 200 times the out-of-pocket expenses of the plaintiff. If *Haslip* required proportionality, it would clearly be in relation to compensatory damages.

This court does not interpret *Haslip* as placing an absolute limit of four times compensatory damages for constitutionally permissible punitive damages. Indeed, earlier in the opinion Justice Blackmon had said:

> We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit in every case. We can say, however, that general concerns of reasonableness and adequate guidance from the court when the case is tried to a jury properly enter into the constitutional calculus.

— U.S. ——, 111 S.Ct. at 1043.

■ This court feels that some reasonable relationship between the amount of punitive damages and the amount of compensatory damages should be required. This case illustrates the difficulty in adopting a precise formula. The Plaintiff suf-

fered compensatory damages in addition to those awarded by the jury. This, however, was not known by the jury at the time punitive damages were set. Neither did the jury adjust its compensatory award to reflect Mendel's interest in the commitment fees, etc., or for an earlier pro tanto settlement with Mendel. Therefore, without adopting a precise formula, the court has seriously considered the relationship between punitive and compensatory damages, along with all of the other relevant factors, in reaching a decision.

On the basis of all relevant factors, the court is of the opinion that a punitive award in a substantial amount is necessary and appropriate to accomplish the goal of punishing this Defendant and deterring others from similar misconduct in the future, but that $18,000,000 is excessive. The court concludes that a punitive award of $10,000,000 will "accomplish society's goal of punishment and deterrence." [13]

The court has addressed earlier its strong feelings concerning the crucial importance to this country's economic system of corporate officers and directors understanding clearly that their first duty is to their corporations, and not to themselves. The jury intended to deliver a forceful message to that effect and the court agrees that that should be done. A $10,000,000 punitive award in this case should certainly accomplish that purpose.

Accordingly, the court finds that the Defendant's motion for a new trial as to punitive damages is due to be granted unless the Plaintiff agrees to a remittitur of $8,000,000 in punitive damages, leaving a punitive damages award of $10,000,000. The Plaintiff will be given 14 days from the date of this order to file a statement of its intentions.

### MENDEL SETTLEMENT

■ Co–Defendant Perry Mendel settled with Plaintiff on a pro tanto agreement to pay $4,500,000 in addition to $295,000 which he had earlier paid into court as partial reimbursement of commitment fees.

---

**13.** *Green Oil,* 539 So.2d at 222.

In exchange, Plaintiff released him from all claims arising out of this matter, which included claims for the same type of equitable relief sought against Grassgreen, and punitive damages.

The parties were in agreement that Grassgreen would be entitled to a credit for some amount of this payment against any judgment that might be rendered against him. Grassgreen elected not to raise this pro tanto settlement with the jury but to leave it for decision by the court post-trial.

Under Alabama law, a pro tanto settlement with a joint tortfeasor works as a release of damages based upon joint and several liability up to the amount of the settlement. *Bucyrus–Erie Co. v. Von Haden*, 416 So.2d 699 (Ala.1982). Thus, Grassgreen is entitled under the law to have the amount of Mendel's settlement, or a part of it, applied as a credit against the damages awarded in this case.

Grassgreen contends that the full amount of the settlement should be credited. Enstar agrees that there should be a credit against that part of the award which is based upon joint liability. Enstar argues, however, that an equitable portion of the Mendel settlement should not be applied because it was given for a release of individual, not joint, liability, such as Plaintiff's claim for forfeiture of compensation paid to Mendel.

The court concludes that an equitable adjustment requires that a portion of the Mendel settlement be considered as going only toward Mendel's individual liability and that a credit for the balance be given against the award based on joint liability.

 Enstar contends that no part of the Mendel settlement should be credited against punitive damages because that award was based on Grassgreen's wrongdoing. Unfortunately, this argument has been rejected by the Supreme Court of Alabama. The current law in this state is that punitive damages cannot be apportioned among joint tortfeasors according to fault and that a settlement of a punitive damages claim by one joint tortfeasor must be credited against a subsequent punitive award against the other tortfeasor. *Tatum v. Schering Corp.*, 523 So.2d 1042 (Ala.1988); *Black Belt Wood Co. v. Sessions*, 514 So.2d 1249 (Ala.1986). Thus, since these damages were based on a state law claim, the court must include punitive damages with joint compensatory damages in that portion of the total award against which a part of the Mendel settlement should be credited.[14]

The compensatory damages awarded by the jury and by the court include the following based on joint liability: commitment fees, Cohen Feit override, Mayer, Brown's fees for special investigation, interest, and profit on the THL investment. This totals $2,746,376.

If the Plaintiff accepts the remittitur ordered by the court, punitive damages will total $10,000,000.

Enstar's claim against Mendel for forfeiture of compensation, a personal liability for which he was released, was for over $6,000,000.

If the court did not consider itself bound by the current state of the Alabama law on apportionment of punitive damages, it would give credit in the amount of $2,746,376 based on the Mendel settlement. Since it does feel so bound, however, the court considers a fair and equitable portion of the Mendel settlement to be credited against joint liability, including punitive damages, to be 68%.

---

14. This court disagrees with the current majority holding of the Supreme Court of Alabama which does not allow punitive damages to be apportioned among joint tortfeasors according to fault. Since punitive damages are meant to punish the defendant for his wrongdoing and to deter others from similar wrongdoing rather than to compensate the plaintiff, it is illogical to say that joint tortfeasors are jointly liable for punitive damages regardless of the degree of their individual fault simply because all contributed to the same injury. The court agrees strongly with the well reasoned comments on this subject by Justices Jones and Houston in their dissenting opinions in *Tatum v. Schering Corp.*, 523 So.2d at 1046–1049. In this case and at this time, however, the court considers itself bound by the holding of the majority in *Tatum*. Otherwise, the court would not allow a credit against punitive damages.

The Mendel settlement totaled $4,798,-183.13.[15] Sixty-eight percent of that is $3,262,765. This amount will be credited against the award in this case.[16]

### CONCLUSION

The Plaintiff is DIRECTED to file within 14 days from the date of this order a statement as to whether it agrees to the remittitur called for by the court. If the plaintiff accepts the remittitur, judgment will be entered in accordance with this memorandum opinion in favor of the Plain-tiff in the amount of $18,280,463.99 [17], with a credit of $3,262,765.00, leaving a judgment balance of $15,017,698.00, such figures to be adjusted for additional daily interest from this date to the date of judgment.

15. $298.183.13 paid out to Plaintiff by the court on March 19, 1992 included interest on the earlier $295,000 payment by Mendel.

16. The court has included this amount of credit in its considerations regarding the appropriate amount of punitive damages. If it had felt compelled to credit the entire Mendel settlement against punitive damages, the amount it approved as punitive damages would have been increased accordingly.

17.

| | |
|---|---:|
| Compensatory award by jury | $ 1,947,549.69 |
| Compensation forfeited | 5,197,663.30 |
| THL profit | 586,461.00 |
| Interest | 548,790.00 |
| Punitive damages | 10,000,000.00 |
| **Total** | **$18,280,463.99** |